[No. C004755. Third Dist. Jan. 30, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
THARON BOB HILL, SR., Defendant and Appellant.

**COUNSEL**

Ross Thomas, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart and George Williamson, Chief Assistant Attorneys General, Arnold O. Overoye and Robert R. Anderson, Assistant Attorneys General, W. Scott Thorpe and Janet G. Bangle, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

PUGLIA, P. J.—A jury convicted defendant of conspiracy to commit first degree murder by explosive. (Pen. Code, §§ 182, 189; further statutory references to sections of an undesignated code are to the Penal Code.) On

appeal, defendant contends the trial court erred: (1) in failing adequately to deal with the jury's request for further instruction, and (2) in denying his new trial motion which was based on jury misconduct in considering the issue of penalty during deliberations. We shall affirm, holding, inter alia, that Evidence Code section 1150, subdivision (a), which excludes evidence of the jurors' subjective reasoning processes to impeach their verdict, has not been abrogated by the "Right to Truth in Evidence" provision of the California Constitution (art. I, § 28, subd. (d)).

In early 1987, defendant came to Chico to live near his estranged wife, Vicky Hill. Defendant wanted to reconcile with Vicky or failing that, to have her killed. On April 20, 1987, Vicky and defendant had a violent argument. Shortly thereafter, Dalton Moss sold defendant six or seven sticks of dynamite, several blasting caps and fuse cord. Defendant planned to dynamite Vicky's truck or trailer home. Defendant's daughter, Shanna Lopes, recommended John Keefe to defendant to carry out his plan. In early May 1987, Keefe agreed for the sum of $1,000 to be paid by defendant to dynamite Vicky's trailer home while Vicky was inside. Defendant gave Keefe some dynamite, blasting caps and fuse cord. Subsequently, Keefe decided not to blow up Vicky's trailer home, but told defendant he would dynamite her truck for the same $1,000 fee. On May 29, 1987, Keefe threw dynamite near Vicky's unoccupied truck, where it exploded.

Defendant still wanted Vicky killed. Dalton Moss delivered four more sticks of dynamite to Lopes for defendant. Lopes arranged for Mike Hoskison to dynamite Vicky's trailer home or truck. On June 25, 1987, Vicky shot Hoskison as he attempted to light dynamite just outside her trailer home. Hoskison ran off a short distance where he collapsed. He died soon thereafter.[1]

Defendant denied any involvement in the May 29 bombing or the June 25 bombing attempt. Defendant specifically denied an agreement with Keefe to dynamite Vicky's trailer home in order to kill her.

---

[1]Count 2 of the information charged defendant with the murder of Hoskison. The jury acquitted defendant on this charge.

The information charged that defendant "conspire[d] with another person [*sic*] to commit the crime of First Degree Murder by Explosive." The theory of the prosecution was that Keefe, Lopes and Moss, all of whom testified for the prosecution under grants of immunity, were coconspirators.

In convicting defendant of conspiracy to commit first degree murder, the jury found two overt acts: (1) defendant obtained dynamite and fuse cord from Dalton Moss in April or May of 1987 and (2) defendant supplied dynamite and fuse cord to John Keefe in May of 1987.

I

█ Defendant contends the trial court committed reversible error by failing adequately to respond to the jury's apparent difficulty with the definitions of "conspiracy" and "overt act." During the second day of deliberations, the jury foreman sent the following note to the trial court: "At what point of time does a person's frame of mind hold them [*sic*] responsible for the act of conspiracy to commit murder [?] Example: At first conspirators planned to commit murder[,] then *before* act was actually committed they changed their minds and agreed to just do damage to property—And please help clarify pages [] 43 & 43A [No. 6.10] in the CALJIC." (Italics in original.)[2]

---

[2] The written instructions were provided to the deliberating jury. One of those, CALJIC No. 6.10, read: "A conspiracy is an agreement entered into between two or more persons with the specific intent to agree to commit the public offense of first degree murder by explosives and with the further specific intent to commit such offense followed by an overt act committed in this state by one or more of the parties for the purpose of accomplish[ing] the object of this agreement. Conspiracy is a crime. [¶] In order to find a defendant guilty of conspiracy, in addition to the proof of the unlawful agreement and specific intent there must [be] proof of the commission of at least one of the overt acts alleged in the information. [¶] It is not necessary to the guilt of any particular defendant that he, himself, committed the overt act if he was one of the conspirators when such act was committed. [¶] The term overt act means any step taken or act committed by one or more of the conspirators which goes beyond mere planning or agreement to commit a public offense and which step or act is done in furtherance of the accomplishment of the object of the conspiracy. [¶] To be an overt act, the step taken or the act committed need not in itself commit the crime, constitute the crime, or even an attempt to commit the crime, which is the ultimate object [of] the conspiracy, nor is it required that such step or act in and of itself be criminal or an unlawful act."

Upon receiving the note, the trial court ordered counsel to appear the next morning to discuss an appropriate response to the jury's question. At the conference, defense counsel suggested the trial court instruct that under the circumstances presented in the jury's example there would be no conspiracy to commit first degree murder. Defense counsel agreed the jurors need not be reminded they could submit additional questions to the court. The prosecutor argued the defendant's suggested instruction would impinge upon the jury's role as fact finder. The trial court decided to refocus the jury's attention upon the conspiracy instructions, CALJIC Nos. 6.10 through 6.24, and directed the jurors to reread those instructions and to consider them in the light of all the other instructions.

When a deliberating jury desires to be informed "on any point of law arising in the case," the jury must be returned to court and "the information required must be given." (§ 1138.)

Defendant asserts the trial court's response to the jury's inquiry was inadequate, because instead of clarifying or enlarging upon the explanation of "conspiracy" and "overt act" in CALJIC No. 6.10, the trial court simply had the jurors reread the conspiracy instructions which presumably they already had read.

We first reject the People's contention that defendant waived this issue by failing to object. (See *People* v. *Kageler* (1973) 32 Cal.App.3d 738, 746 [108 Cal.Rptr. 235]; *People* v. *Chagolla* (1983) 144 Cal.App.3d 422, 432-433 [193 Cal.Rptr. 711].) Although defense counsel stated he did not want the jurors specifically reminded they could submit to the court additional questions, he did not "tacitly approve" the trial court's instruction to the jurors to reread CALJIC Nos. 6.10-6.24 in light of all the other instructions. Defense counsel specifically requested that the jury's inquiry be answered directly. The trial court refused that request. No objection was required to preserve the point for appeal. (§ 1259.)

The jury's question indicated uncertainty as to the synergizing effect of an overt act upon an agreement to commit a crime. This is

explained in CALJIC No. 6.10 which defines conspiracy as an agreement to commit a crime "followed by" an overt act done for the purpose of accomplishing the object of that agreement.

■ "The court has a primary duty to help the jury understand the legal principles it is asked to apply. (*People* v. *Thompkins* (1987) 195 Cal.App.3d 244, 250-251 [240 Cal.Rptr].) This does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information. (*People* v. *Gonzalez* (1990) 51 Cal.3d 1179, 1213 [275 Cal.Rptr. 729, 800 P. 2d 1159].) Indeed, comments diverging from the standard are often risky. (E.g., *People* v. *Lee* (1979) 92 Cal.App.3d 707, 716 [155 Cal.Rptr. 128].)" (*People* v. *Beardslee* (1991) 53 Cal.3d 68, 97 [279 Cal.Rptr. 276, 806 P.2d 1311].)

■ After consulting counsel and considering the matter, the trial court in its discretion decided a direction to the jury to reread certain instructions was the appropriate response. Although the court did not directly address the issue of abandonment of the conspiracy implied in the example given in the jury's inquiry, its response was adequate to the occasion. (Cf. *Beardslee, supra*, 53 Cal.3d at pp. 96-97.) There was no error.

Moreover, if, as defense counsel urged, the trial court had directly answered the jury's inquiry, it would have been constrained to inform the jury that once conspirators agree to murder and one of the conspirators commits an overt act in furtherance of that end, the crime of conspiracy to murder is complete, and the conspirators are not relieved of criminal liability therefor even though they subsequently agree to abandon that object and agree instead only to damage property. The conspirators' abandonment of the agreement to murder would preclude conviction for conspiracy to commit murder only if such abandonment precedes the commission of an overt act by a conspirator in furtherance of the object of murder. (*People* v. *Sconce* (1991) 228 Cal.App.3d 693, 701-703 [279 Cal.Rptr. 59]; see 4 Wharton's Criminal Law (14th ed. 1981) § 734, p. 557.)

Given the evidence before the jury, this clarifying instruction could hardly have been to defendant's advantage. The prosecution evidence established that defendant and Keefe agreed to murder Vicky Hill, and to achieve

that object defendant gave Keefe dynamite, blasting caps and fuse cord. The defense was denial of any involvement in a conspiracy, a defense which the jury disbelieved, implicitly finding an agreement to murder and expressly finding the transfer of explosive materials from defendant to Keefe occurred and constituted an overt act. The prosecution evidence consistently shows that the crime of conspiracy was complete before Keefe changed his mind and told defendant he would dynamite Vicky's truck but not her trailer house. There was no evidence the conspirators abandoned their original objective before an overt act was performed, i.e., before Keefe received the explosive materials from defendant. Had the court delivered a legally correct exegesis on the jury's hypothetical question, the jury, having rejected defendant's evidence, would have been led inexorably to the identical verdict that was in the event returned, guilty of conspiracy to commit first degree murder. Thus, even if it were error not to answer directly the jury's question, it was harmless beyond a reasonable doubt.

## II

Defendant contends the jurors improperly considered the question of penalty during deliberations. Defendant's motion for new trial (§ 1181) was supported by the declarations of three jurors who stated they had heard in deliberations that defendant would probably face only six months in jail if convicted of conspiracy to commit first degree murder. The trial court denied the motion for new trial. We find no error.

Juror Terri Miller declared that during deliberations she had been undecided on the conspiracy count. The reason she voted guilty was because she was "convinced by other jurors that [defendant] had committed an overt act of the conspiracy." Her declaration continued: "[D]uring this period when I changed my mind from undecided to guilty, I heard another juror whose identity is unknown state that [defendant] probably would only get six months for what he had done." Miller then attempted to persuade Juror Jean Passmore, who was undecided, to vote guilty because defendant had committed an overt act. Miller also related to Passmore that defendant "would probably only get six months for what he had done . . . ."

Passmore's declaration confirmed that Miller told her defendant "would only receive six months for what he had done." "Shortly after hearing this comment," Passmore declared, she "changed [her] vote by stating to [the foreman], 'if that's the way it has to be then that's the way it has to be.'" Aside from this cryptic statement, Passmore did not expressly state in her declaration why she changed her vote. To the contrary, her declaration is ambiguous as to whether she in fact voted guilty. Therein Passmore asserts

she did not find defendant guilty beyond a reasonable doubt; she did not want to vote guilty, and her affirmative response when the clerk polled the jury meant only that the verdict as read "[is] the one that had been filled out in the jury room."

A third juror, Charlet Manjeot, stated in her declaration that she recalled hearing somebody say "something to the effect of a six-month sentence or he would only get six months." Manjeot did not claim to have been influenced to vote guilty by this statement and, accepting her declaration at face value, it is difficult to perceive how she could have been because she flatly denied she had voted guilty. According to her declaration, she did not realize a verdict of guilty was being taken into court by the jury, and she did not remember being polled by the clerk or stating "yes" in response to the clerk's poll whether the verdict as read was her verdict.

The declarations of the other nine jurors were presented by the prosecution. All of these jurors stated they had heard nothing during deliberations concerning penalty or punishment.

Juror Miller did not testify at the hearing on the new trial motion. Juror Manjeot did testify and affirmed her declaration was correct but did not expressly mention the subject of penalty or punishment. Her testimony dealt exclusively with her insistence that she had never voted guilty. Juror Passmore also testified and affirmed her declaration was correct. She then testified that she changed her vote to guilty because she heard it said that defendant "would only get six months."

Evidence Code section 1150, subdivision (a) states: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."

Evidence Code section 1150, subdivision (a), "thus makes a 'distinction between proof of overt acts, objectively ascertainable, and proof of the subjective reasoning processes of the individual juror, which can be neither corroborated nor disproved . . . .' (*People* v. *Hutchinson* (1969) 71 Cal.2d 342, 349 [78 Cal.Rptr. 196, 455 P. 2d 132].) 'This limitation prevents one juror from upsetting a verdict of the whole jury by impugning his own or his fellow jurors' mental processes or reasons for assent or dissent.' (*Id.*, at

p. 350; *People* v. *Ozene* (1972) 27 Cal.App.3d 905, 914 [104 Cal.Rptr. 170].)" (*People* v. *Cox* (1991) 53 Cal.3d 618, 694 [280 Cal.Rptr. 692, 809 P.2d 351].)

 Defendant now raises an issue not tendered in the trial court. For the first time on appeal, defendant contends that the second sentence of Evidence Code section 1150, subdivision (a), prohibiting the admissibility of evidence of a juror's subjective reasoning process, has been abrogated by article I, section 28, subdivision (d) of the California Constitution, (section 28(d)) enacted at the June 1982 election as part of Proposition 8. That provision states in pertinent part: "Right to Truth-in-Evidence. Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, *relevant evidence* shall not be excluded in any criminal proceeding, including pretrial and post conviction motions and hearings, or in any trial or hearing of a juvenile for a criminal offense, whether heard in juvenile or adult court. Nothing in this section shall affect any existing statutory rule of evidence relating to privilege or hearsay, or Evidence Code, [*sic*] Sections 352, 782, or 1103." [Italics added.]

Defendant asserts the evidence regarding the jurors' subjective mental processes, which would otherwise be excluded by Evidence Code section 1150, subdivision (a), should now by force of section 28(d) be deemed admissible.

Section 28(d) deals with the admission of "relevant evidence." As we shall explain, the second sentence of Evidence Code section 1150, subdivision (a), embodies a substantive rule of law, derived from the common law, which renders a juror's subjective reasoning process irrelevant.

"Relevant Evidence" is defined by Evidence Code section 210 which provides: " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."

We are cited to no authority, nor are we aware of any, to the effect that the meaning of the term "relevant evidence" as used in section 28(d) is not precisely congruent with the meaning of that same term as defined in Evidence Code section 210. Indeed, nothing to the contrary appearing, it is reasonable to assume, and we do so assume, that the enactors of section 28(d) intended the Evidence Code definition, which was enacted in 1965, to govern the interpretation of "relevant evidence" as used in the later enacted section 28(d). (See *Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645-646 [335 P.2d 672].)

In defining "relevant evidence," Evidence Code section 210 encompasses a broad concept of relevance. That concept comprehends both the probative value of evidence and its relationship to a matter which is provable in the action. Relevance in the narrower sense deals with the probative value of evidence. The relationship of evidence to a provable matter is, properly understood, a question of materiality. Due to imprecise usage and misunderstanding, "materiality" is commonly used interchangeably and synonymously with "relevance." To avoid confusion, the Evidence Code "substitutes the word 'disputed' for 'material' and covers this correct concept of materiality in the single definition of 'relevant evidence' " in Evidence Code section 210. (1 Witkin, Cal. Evidence (3d ed. 1986) § 286, pp. 255-256.)

As Witkin explains: "A 'material matter' is one 'the existence or nonexistence of which is provable in the action.' (Model C., Rule 1(8).) In other words, materiality depends on the *issues in the case*; evidence which does not relate to a matter in issue is *immaterial*. (See 29 Cal. L. Rev. 690; McCormick 3d, § 185; 1 Wigmore (Tillers Rev.) § 2; 29 Am.Jur.2d, Evidence § 251.)" (1 Witkin, Cal. Evidence (3d ed. 1986), § 286, p. 255, original italics.) Thus, as broadly defined by Evidence Code section 210, "relevant evidence" has two distinct dimensions: (1) probative value, i.e., the "tendency [of the evidence] in reason to prove or disprove" the proposition for which it is offered and (2) relationship to a matter which is provable in the action, i.e., the "tendency [of the evidence] in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." Under the broad definition of "relevant evidence" in Evidence Code section 210, evidence which has no "tendency in reason to prove or disprove any disputed fact of consequence to the determination of the action" is irrelevant. So also is evidence which *does have* "any tendency in reason to prove or disprove any . . ." fact which is not of consequence to the determination of the action.

Materiality, i.e., what matters are in issue, "is determined mainly by the pleadings, the rules in pleading and the substantive law relating to the particular kind of case. (See 29 Cal. L. Rev. 690; McCormick 3d, § 185; 2 Wigmore (Tillers Rev.) § 2; . . ." (1 Witkin, Cal. Evidence, *op. cit. supra*, § 286, pp. 255-256.)

As Wigmore explained it, the common law rule prohibiting a juror from impeaching his own verdict derived from three general and independent principles, those relating to privileged communications, parol evidence, and self-stultifying testimony. (8 Wigmore, Evidence (McNaughton ed. 1961) § 2345, p. 677.) Under the parol evidence aspect of the rule, the "verdict of a jury is an operative act, like a will or a contract or a judgment,

and the parol evidence rules govern it in special applications adopted to its circumstances." (*Ibid.*; citations omitted.) Thus, among other restrictions, "[t]he *negotiations* and *motives* preceding and leading up to the final act of uttering the verdict are immaterial and cannot be used to set aside or to vary the verdict as uttered." (*Ibid.*; citation omitted and italics in original.) The principle underlying this feature of the parol evidence rule is that "where the existence and tenor of a jural act—i.e., an utterance to which legal effects are attached—are in issue, the outward utterance as finally and formally made, and not the prior and private intention, is taken as exclusively constituting the act; and therefore where the act is required (as judicial proceedings are) to be made in writing, the writing is the act." (*Id.*, § 2348, p. 679, citations omitted.) Consequently, the "*jurors' deliberations* during retirement, their expressions, arguments, motives and beliefs represent that state of mind which must precede every legal act and is in itself of no jural consequence. The verdict as finally agreed upon and pronounced in court by the jurors must be taken as the sole embodiment of the jury's act. Hence it stands irrespective of what led up to it in the privacy of the jury room, precisely as the prior negotiations of the parties to a contract disappear from legal consideration when once the final agreement is reduced to writing and signed." (*Id.*, § 2348, p. 680; citations omitted and italics in original.) "The policy which requires this," Wigmore continues, "is the same which forbids a consideration of the negotiations of parties to a contract leading up to the final terms as deliberately embodied in their deed, namely, the loss of all certainty in the verdict, the impracticability of seeking for definiteness in the preliminary views, the risk of misrepresentation after disclosure of the verdict, and the impossibility of expecting any end to trials if the grounds for the verdict were allowed to effect its overthrow." (*Id.*, § 2349, p. 681; fn. omitted.) Thus, the rule renders the jurors' subjective thought processes immaterial and of no jural consequence. From this it follows that evidence that the jurors misunderstood the judge's instructions, were influenced by an improper remark of a fellow juror, assented under an erroneous belief that the judge would use clemency or had the legal right to vary the sentence, or had been influenced by inadmissible evidence is simply of no legal significance. (*Ibid.*) In short, under both the common law and Evidence Code section 1150, the jurors' motives, beliefs, misunderstandings, intentions, and the like are immaterial.

The federal analogue to Evidence Code section 1150 is rule 606(b) of the Federal Rules of Evidence (tit. 28, U.S.C.A. Fed. Rules of Evidence).[3] "As a practical matter, . . . the exclusionary principle [embodied in rule 606(b)]

---

[3]Rule 606(b) provides: "Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as

imposes what amounts to limits upon the ground of permissible impeachment of jury verdicts. That is the obvious result of a rule which significantly restricts the use of the only sure source of information as to occurrences during the jury's deliberations." (3 Louisell & Mueller, Federal Evidence § 286, p. 118 (1979).) Thus, although a "sure source of information" may yield evidence of probative value, that evidence is nonetheless excluded from an inquiry into the validity of a verdict.

"Federal Rule of Evidence 606(b) is grounded in the common-law rule against admission of jury testimony to impeach a verdict and the exception for juror testimony relating to extraneous influences." (*Tanner* v. *United States* (1987) 483 U.S. 107, 121 [97 L.Ed.2d 90, 107 S.Ct. 2739].) As explained by the federal high court, the rule finds its rationale in "[s]ubstantial policy considerations [which] support the common-law rule against the admission of jury testimony to impeach a verdict. As early as 1915 this Court explained the necessity of shielding jury deliberations from public scrutiny: [¶] '[L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation—to the destruction of all frankness and freedom of discussion and conference.' *McDonald* v. *Pless*, [(1915)] 238 U.S. [264,] 267-268 [59 L.Ed. 1300, 1302, 35 S.Ct. 783] . . . [¶] . . . Allegations of juror misconduct, incompetency, or inattentiveness, raised for the first time days, weeks, or months after the verdict, seriously disrupt the finality of the process. [Citation.] Moreover, full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of postverdict scrutiny of juror conduct. See Note, Public Disclosures of Jury Deliberations, 96 Harv. L. Rev. 886, 888-892 (1983)." (*Tanner* v. *United States, supra,* 483 U.S. at pp. 119-121 [97 L.Ed.2d at pp. 105-106].)

Although the *Tanner* court acknowledged "[t]here is little doubt that postverdict investigation into juror misconduct would in some instances lead

---

influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes."

to the invalidation of verdicts reached after irresponsible or improper juror behavior" (483 U.S. at p. 120 [97 L.Ed.2d at p. 106]), it nevertheless concluded, portentously: "It is not at all clear . . . that the jury system could survive such efforts to perfect it." (483 U.S. at p. 120 [97 L.Ed.2d at p. 106].)

Like rule 606(b) of the Federal Rules of Evidence, Evidence Code section 1150, subdivision (a), expresses a substantive policy delimiting the issues "[u]pon an inquiry as to the validity of the verdict." The first sentence of Evidence Code section 1150, subdivision (a), in effect provides that objectively ascertainable overt acts "of such a character as [are] likely to have influenced the verdict improperly" are material upon such an inquiry. The second sentence of Evidence Code section 1150, subdivision (a), in effect declares that the subjective reasoning process of a juror is not material upon such an inquiry. By force of Evidence Code section 1150, subdivision (a), the subjective reasoning process of a juror is not a "disputed fact that is of consequence to the determination of the action" within the meaning of Evidence Code section 210. With respect to that which is material upon such an inquiry, i.e., objectively ascertainable overt acts likely to have influenced the jury improperly, evidence "having any tendency in reason to prove or disprove" such acts is relevant (Evid. Code, § 210) and, subject to the provisions of Evidence Code section 352, is admissible.

The same policy considerations which underpin Federal Rules of Evidence rule 606(b) also inform the limiting effect of Evidence Code section 1150, subdivision (a), in relation to which it has been said: "[I]f the law were that reviewing courts could consider jurors' statements about the effect of error on the verdict, jurors would be hounded for their statements by losing parties in every case, not just in cases of juror misconduct, and the whole nature of appellate review for prejudice would be degraded from a consideration of the objective record to an attempt to delve into the thoughts, feelings, and motivations of the jurors who often would not accurately be able to trace or articulate their different paths to the verdict. Such a trial of the jury would make the jury system completely unworkable." (*People* v. *Aris* (1989) 215 Cal.App.3d 1178, 1200, fn. 6 [264 Cal.Rptr. 167].)

Section 28(d) commands that "relevant evidence" not be excluded in a criminal case. As defined by Evidence Code section 210, "relevant evidence" has two distinct characteristics: (1) probative quality and (2) materiality. Materiality is generally a function either of the issues tendered by the pleadings or of substantive law expressive of public policy. As a matter of policy, Evidence Code section 1150, subdivision (a), excludes evidence of the subjective reasoning processes of jurors to impeach their verdicts. Since

such evidence is not material, it is not "relevant evidence" as defined in Evidence Code section 210, nor, perforce, as used in section 28(d).[4]

■ It remains for us to determine whether, given the *admissible* evidence adduced to impeach the verdict, the trial court erred in denying the motion for new trial.[5] According to that evidence, jury deliberations spanned two days, commencing at 1 p.m. on April 20 and concluding at 2:40 p.m. on April 22. During this period the jury submitted two questions to the court, one regarding immunity granted to certain witnesses and the other regarding conspiracy and overt act, as previously described in part I, *ante*. Several votes, both written and oral, were taken during this period. The final vote finding defendant guilty was an oral vote. The record does not show precisely when during the course of the two day deliberations any of these votes was taken.

Prior to the last *written* vote juror Miller heard an unidentified juror state defendant probably would receive only a six-month sentence. In the last *written* vote, 10 voted for guilty and 2, Passmore and Manjeot, were undecided. Miller voted with the majority for guilt. The record does not disclose

---

[4]The dissent argues that the relevancy and materiality of the evidence in question is to be determined by the law governing juror misconduct, and not by Evidence Code section 1150. The argument misses the point. When under the substantive law, a certain class of evidence, even if credible and uncontradicted, has no legal significance—has no "jural consequence" in the words of Wigmore—then that evidence, by definition, is immaterial in the traditional sense and irrelevant under the broader concept of Evidence Code section 1150, subdivision (a). Section 28(d) does not purport to make immaterial or irrelevant evidence admissible in criminal cases. Thus, it has no effect on Evidence Code section 1150, subdivision (a).

[5]The dissenting justice would decline to consider and rule upon defendant's contention that the limitations of Evidence Code section 1150, subdivision (a) are overriden by section 28(d) because, he asserts, the prosecutor failed to move to strike, thus permitting the trial court to consider the putatively irrelevant evidence of juror misconduct. However, defendant does not make that contention on appeal and the point is therefore waived. (9 Witkin, Cal. Procedure (3d ed. 1989), Appeal, § 479, pp. 469-471.) But in his zeal to tax the People with their alleged default, the dissenting justice airiiy ignores the defendant's default and reaches out gratuitously to grasp at an issue which has neither been tendered nor briefed. The reason for this unusual strategem is unclear, although if it were to command a majority of this panel it would avoid a definitive ruling on that part of Proposition 8 (§ 28(d)) at issue here.

Moreover, we do not agree that the prosecutor failed to preserve his objections to those parts of the dissident jurors' declarations and testimony which are rendered inadmissible by Evidence Code section 1150, subdivision (a). At the new trial hearing the prosecutor repeatedly objected to the inadmissible testimony. Before submission, pursuant to the express invitation of the court, the prosecutor renewed his objections in argument with respect to both the declarations and the testimony. Immediately upon conclusion of argument the court denied the motion for new trial without indicating how it ruled on the prosecution's objections. At that juncture it would have been pointless for the prosecutor to press for a ruling on his objections. The People were not aggrieved by the order denying new trial and on appeal could rely on the presumptions and intendments in favor of the judgment. (See 6 Witkin, Cal. Criminal Law (2d ed. 1986) Appeal, § 3206, p. 3964.)

at what point in time during the deliberations the last written vote was taken. Sometime during the period between the last written vote and the final, oral vote Miller sought to persuade Passmore to vote guilty because defendant had committed an overt act. At this time Miller also told Passmore that defendant would probably be sentenced to only six months. During this time Manjeot "heard somebody state" defendant would receive only a six-month sentence. "Shortly after" her discussion with Miller, Passmore apparently advised the jury foreman she would change her vote to guilty by stating, "if that's the way it has to be, then that's the way it has to be." When this change of vote occurred in relation to the final, oral vote, the record does not disclose. As demonstrated by her response to the jury poll, at some undisclosed time after the last written vote, Manjeot also changed her vote to guilty.[6]

Before beginning deliberations the jury was instructed: "In your deliberations the subject of penalty or punishment is not to be discussed or considered by the jury. That is not [*sic*] a matter which must not in any way affect your verdict."[7]

According to the record, juror Miller and an unidentified juror disregarded the trial court's instruction not to discuss penalty or punishment. This constituted juror misconduct. We must determine whether the trial court correctly concluded that the presumption such misconduct is prejudicial had been dispelled.

■ Juror misconduct raises a presumption of prejudice. (*People* v. *Holloway* (1990) 50 Cal.3d 1098, 1108 [269 Cal.Rptr. 530, 790 P.2d 1327]; *Hasson* v. *Ford Motor Co.* (1982) 32 Cal.3d 388, 416 [185 Cal.Rptr. 654, 650 P.2d 1171]; *People* v. *Honeycutt* (1977) 20 Cal.3d 150, 156 [141 Cal.Rptr. 698, 570 P.2d 1050].) "The presumption of prejudice is an evidentiary aid to those parties who are able to establish serious misconduct of a type likely to have had an effect on the verdict or which deprived the complaining party of thorough consideration of his case, yet who are unable to establish by a preponderance of the evidence that actual prejudice occurred. The law thus recognizes the substantial barrier to proof of prejudice which Evidence Code section 1150 erects, and it seeks to lower that barrier somewhat." (*Hasson* v. *Ford Motor Co., supra*, 32 Cal.3d at p. 416.)

---

[6]The dissent implies, inaccurately, that the jury reached a unanimous verdict shortly after Passmore changed her undecided vote to guilty. The record simply does not disclose, directly or inferentially when with respect to Passmore's change of vote the final vote was taken. For all the record shows, Passmore may well have been the 11th juror to vote for guilty leaving the 12th (Manjeot) still to be convinced. Under this scenario one can only speculate how long it took to convince Manjeot to vote guilty.

[7]It is not contended that the jury was confused or misled by the apparently inadvertent double negative in the last sentence of the instruction.

It does not, however, eliminate the barrier altogether. The defendant, as the moving party, must still prove serious misconduct of a nature likely to have affected the verdict. And even where the presumption arises, "it may be rebutted by an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party resulting from the misconduct." (*Hasson* v. *Ford Motor Co., supra*, 32 Cal.3d at p. 417; *People* v. *Miranda* (1987) 44 Cal.3d 57, 117 [241 Cal.Rptr. 594, 744 P.2d 1127].)

In *People* v. *Marshall* (1990) 50 Cal.3d 907 [269 Cal.Rptr. 269, 790 P.2d 676], the Supreme Court reexamined the prejudice analysis in connection with juror misconduct and adopted the following objective test taken from the American Bar Association Standards for Criminal Justice (2 ABA Standards for Criminal Justice, std. 8-3.7 (2d ed. 1980) p. 8.57): "A judgment adverse to a defendant in a criminal case must be reversed or vacated 'whenever . . . the court finds a substantial likelihood that the vote of one or more jurors was influenced by exposure to prejudicial matter relating to the defendant or to the case itself that was not part of the trial record on which the case was submitted to the jury.' . . .

" 'The ultimate issue of influence on the juror is resolved by reference to the substantial likelihood test, an objective standard. In effect, the court must examine the extrajudicial material and then judge whether it is inherently likely to have influenced the juror.' [¶] Such 'prejudice analysis' is different from, and indeed less tolerant than, 'harmless-error analysis' for ordinary error at trial. . . . When the misconduct in question supports a finding that there is a substantial likelihood that at least one juror was impermissibly influenced to the defendant's detriment, we are compelled to conclude that the integrity of the trial was undermined: under such circumstances, we cannot conclude that the jury was impartial. By contrast, when the misconduct does not support such a finding, we must hold it nonprejudicial." (*People* v. *Marshall, supra*, 50 Cal.3d at pp. 950-951; citations omitted.)

Under this objective standard emphasis is on the nature and extent of the alleged misconduct and not other extraneous but objectively verifiable facts. Thus, regardless of evidence that one or more jurors changed their votes after receiving extrajudicial information, our concern is with the misconduct itself and whether it is "inherently likely" to have influenced a reasonable juror.

This objective approach finds justification in the inherent mystery of jury deliberations. In a given case it is virtually impossible to determine what influenced a particular juror's vote; an unlimited number of factors may contribute to such a decision. In order to assess fully the impact of any one

factor it would be necessary to analyze the personality of each juror and recreate the entire deliberation process, a virtually impossible task. Instead, an objective standard permits a court to look at the misconduct alone as it relates to the issues in the case and determine whether it is substantially likely to have affected the vote of a reasonable juror.

■ The alleged misconduct here is distinguishable from that in cases where information was received by deliberating jurors from an outside source. In contrast to jurors themselves, outside sources of information often have about them an aura of authoritativeness. For example, in *People* v. *Honeycutt, supra,* 20 Cal.3d 150, a first degree murder prosecution, a juror contacted an attorney friend and obtained an explanation regarding an involuntary manslaughter charge and diminished capacity; in *People* v. *Holloway, supra,* 50 Cal.3d 1098, a first degree murder prosecution, a juror read a newspaper story during trial indicating defendant was on parole after having served time for assault; in *People* v. *Karis* (1988) 46 Cal.3d 612 [250 Cal.Rptr. 659, 758 P.2d 1189], one juror consulted a dictionary to clarify the court's instruction on "mitigating" a possible death sentence and another juror resorted to a local library for books written by a defense expert. Here the source of the extrajudicial information was one or more of the jurors themselves. There is no evidence this source was either represented or perceived as being specially informed or knowledgeable on the subject of punishment for crime.

It cannot be gainsaid that jurors enter upon deliberations influenced by more than just the court's instructions. "The jury system is an institution that is legally fundamental but also fundamentally human. Jurors bring to their deliberations knowledge and beliefs about general matters of law and fact that find their source in everyday life and experience. That they do so is one of the strengths of the jury system. It is also one of its weaknesses: it has the potential to undermine determinations that should be made exclusively on the evidence introduced by the parties and the instructions given by the court. Such a weakness, however, must be tolerated. '[I]t is an impossible standard to require . . . [the jury] to be a laboratory, completely sterilized and freed from any external factors.' (*Rideau* v. *Louisiana* (1963) 373 U.S. 723, 733 [10 L.Ed.2d 663, 669, 83 S.Ct. 1417] (dis. opn. of Clark, J.).) Moreover, under that 'standard' few verdicts would be proof against challenge." (*People* v. *Marshall, supra,* 50 Cal.3d at p. 950.)

For example, it is the rare juror indeed who does not suspect a defendant in a personal injury action is insured for any recovery awarded. It is also rare for jurors not to have some preconceived, and possibly ill-conceived, notion of the penalty associated with a particular crime. To harbor these thoughts is not misconduct. Only when a juror disregards an instruction and introduces

these matters into the jury's deliberations does misconduct arise. When this occurs prejudice depends upon the nature and source of the information as well as how the information relates to the issues at hand.

Undoubtedly, statements regarding legal issues carry greater weight, and hence are more likely to prejudice the verdict, when they come from a juror trained in the law. Thus, in *In re Stankewitz* (1985) 40 Cal.3d 391 [220 Cal.Rptr. 382, 708 P.2d 1260], a juror propounded an incorrect statement on the elements of robbery while vouching for the correctness of the statement with his 20 years of service as a police officer. The court concluded the presumption of prejudice was especially strong in this instance because it was a capital case and the misconduct went to a key issue in the prosecution's felony-murder charge. (*Id.* at p. 402.)

By contrast, references to penalty here involved a matter not material to the issues presented to the jury. It is therefore more analogous to the alleged misconduct in *Gorman* v. *Leftwich* (1990) 218 Cal.App.3d 141 [266 Cal.Rptr. 671], a medical malpractice action. There the defendant charged misconduct based on a declaration that "during deliberations the jurors 'discussed whether [defendant] had medical malpractice insurance' and that '[v]arious jurors said she most likely had medical malpractice insurance and the insurance company would pay the claim.' " The court pointed out "[t]he declaration contains no allegation that any of the jurors agreed to base their verdict upon this discussion regarding insurance. The other four juror declarations filed on behalf of defendant make no mention of insurance being discussed during deliberations." (*Id.* at p. 147.) The court then rejected the charge of misconduct, concluding: "If insurance had any impact upon the verdict, the single declaration would have so stated. '[T]o establish misconduct requiring reversal, juror declarations must establish "[a]n express agreement by the jurors to include such [consideration of insurance] in their verdict, or extensive discussion evidencing an implied agreement to that effect." [Citation.]' (*Moore* v. *Preventive Medicine Medical Group, Inc.* (1986) 178 Cal.App.3d 728, 740 [223 Cal.Rptr. 859].) Here, as in *Moore*, the declaration does 'not suggest an express agreement was reached and the discussion [it] relate[s] could hardly be characterized as extensive.' (*Id.*, at pp. 740-741, fn. omitted.) ▆▆▆▆▆ Upon this record, we are satisfied that if insurance was mentioned at all, the discussion was not, in the words of Evidence Code section 1150, subdivision (a), 'of such a character as is likely to have influenced the jury improperly.' " (*Gorman* v. *Leftwich, supra,* 218 Cal.App.3d at p. 147.)[8]

---

[8]In *Moore* v. *Preventive Medicine Group, Inc.* (1986) 178 Cal.App.3d 728 [223 Cal.Rptr. 859], the court found no prejudice where jurors, in considering damages, discussed how much of the recovery the plaintiff's attorney would receive.

Although *Moore* and *Gorman* are civil cases, the decisions draw no distinction between civil and criminal cases in considering jury misconduct. In *Hasson* v. *Ford Motor Co., supra,* 32 Cal.3d 388, the court rejected plaintiff's contention that the presumption of prejudice

■ Here, as in *Gorman*, the allusions to improper matter were isolated and infrequent. There is no evidence of a multilateral discussion of penalty nor competent evidence that penalty was considered. The evidence shows only two or three isolated statements relating to penalty as to which there were no responses. The first of these isolated statements originated with an unidentified source within the jury itself and, as with the similar succeeding statements, was couched in terms merely of a probability that the defendant would receive a six-month jail sentence. Unlike in *Stankewitz*, where the extrajudicial information also originated with a juror, this information was neither represented nor presented as authoritative. Thus, even if there are circumstances where it would be objectively reasonable for a juror to believe and rely on a statement that one convicted of the serious crime of conspiracy to commit murder would receive only a six month jail sentence, those circumstances are not present here. Such reliance is not reasonable where, as here, the statement is mere speculation by someone with no special knowledge of the subject. Thus the misconduct here was not "inherently likely" (*Marshall, supra,* 50 Cal.3d pp. 950-951) to have affected the vote of any of the jurors.

We are further persuaded to this conclusion by the inconsistencies in the evidence of misconduct. In addition to the nature and seriousness of the misconduct, courts have recognized the strength of the evidence of misconduct and the probability that actual prejudice may have ensued is relevant to a determination whether the presumption of prejudice has been rebutted. (*Hasson* v. *Ford Motor Co., supra,* 32 Cal.3d at p. 417.) Here, Juror Miller indicated she heard the statement from an unknown source before the last written vote. Jurors Passmore and Manjeot heard it between the last written vote and the final vote which was oral. Passmore's source was Miller; Manjeot's source was unknown.

In order for Miller to have heard the statement *prior to the last written vote,* and thus before Passmore and Manjeot heard it, the source must have

---

should not apply in a civil case. According to the court, "civil litigants, like criminal defendants, have a constitutionally protected right to the complete consideration of their case by an impartial panel of jurors. (U.S. Const., 7th Amend.; Cal. Const., art. I, § 16; *Andrews* v. *County of Orange* (1982) 130 Cal.App.3d 944, 953 [182 Cal.Rptr. 176].) *People* v. *Honeycutt, supra,* 20 Cal.3d 150, 156, footnote 3, relied in part on civil cases applying a rebuttable presumption of prejudice. (See also *Smith* v. *Covell* (1980) 100 Cal.App.3d 947, 953-954 [161 Cal.Rptr. 377].) Code of Civil Procedure section 475 does not compel a different result. That section states in pertinent part: 'There shall be no presumption that error is prejudicial, or that injury was done if error is shown.' We long ago rejected a rigid interpretation of [Code of Civil Procedure] section 475 in *San Jose Ranch Co.* v. *San Jose Land & Water Co.* (1899) 126 Cal. 322, 324-325 [58 P. 824]. Furthermore, parallel provisions in the California Constitution and the Penal Code have not prevented us from applying the presumption in criminal cases. (See Cal. Const., art. VI, § 13; Pen. Code, §§ 1258, 1404.) No principled distinction can be drawn between civil and criminal cases for purposes of the presumption of prejudice arising from juror misconduct." (*Id.* at pp. 416-417; citations omitted.)

been one of the other nine jurors. Yet the other nine swore they heard no such statement. Passmore indicated she heard the statement from Miller during a discussion "between jury members" and herself. Manjeot indicated she heard it "[d]uring the discussion which ensued between the last written vote" and the final, oral vote. It is implicit in these declarations that the statements were made during general deliberations among the jurors, yet none of the other nine jurors heard them.[9]

The declaration and testimony of Manjeot is further suspect because she testified she never agreed to vote guilty of "conspiracy to commit first degree murder or committing first degree murder." On motion for new trial, the trial court rejected this claim on the basis of Manjeot's affirmative response to the jury poll after the verdict was read. The declaration and testimony of Passmore, being only slightly less fantastical than those of Manjeot, are also suspect. In her declaration, Passmore implied what Manjeot expressly asserted: that she did not vote guilty. That is the clear inference to be drawn from Passmore's attempt to explain her affirmation of the guilty verdict during the jury poll by asserting that she meant to affirm thereby only that the verdict as read was the one filled out in the jury room. Six weeks after so stating in her declaration, Passmore affirmed the correctness of her declaration in testimony at the hearing on the new trial motion and then asserted, inconsistently, that she did vote for guilt.[10]

Considering the credibility issues raised by the conflicts in the declarations and testimony, the evidence of misconduct is not strong. (See *People* v. *Morris* (1991) 53 Cal.3d 152, 232 [279 Cal.Rptr. 720, 807 P.2d 949].) The record discloses three jurors changed their votes to guilty after hearing a statement regarding penalty. However, the record is silent as to when during the 49 hours between the start and finish of deliberations the statements concerning penalty were made or the votes were taken. The final vote may have been taken well after the statements were made and following substantial discussion among the jurors of matters properly before them. Miller first heard a statement concerning penalty during a discussion of overt acts after

---

[9]While the declarations of Passmore and Manjeot might be interpreted as establishing that Miller made a single statement to them alone, which statement was not overheard by the other jurors, the record is devoid of any basis for such reading of the evidence. The trial court instructed the jury not to discuss the case unless all members were present and, absent contrary evidence, we must assume this instruction was followed. (*People* v. *Adcox* (1988) 47 Cal.3d 207, 253 [253 Cal.Rptr. 55, 763 P.2d 906].) There is nothing in the record to suggest all jurors were not present during the alleged discussions or could not have heard what was being said by others in the jury room. The suggestion in the dissent that the jurors engaged in "enclave deliberations" (dis., opn., *post*, p. 49) is rank speculation.

[10]The new trial motion attacked the verdict on two grounds: (1) jury misconduct and (2) lack of jury unanimity. Lack of unanimity, based on juror Manjeot's testimony, was rejected by the trial court and is not raised on appeal.

which she changed her vote to guilty. Both Passmore and Manjeot heard the statement in the midst of other discussions or other comments which were presumably relevant to the jury's deliberations. There is no reason to believe the improper information was any more persuasive than the other information being discussed. In fact Miller indicated she tried to convince Passmore to vote guilty "due to the fact [defendant] had committed one of the overt acts as listed in the jury instructions."[11]

■ Our task on appeal is to review the record independently. However, we still accord great deference to the trial judge's evaluation of prejudicial effect. (*Akers* v. *Kelley Company, Inc.* (1985) 173 Cal.App.3d 633, 657 [219 Cal.Rptr. 513]; *Andrews* v. *County of Orange* (1982) 130 Cal.App.3d 944, 954-955 [182 Cal.Rptr. 176].) ■ The trial court concluded the declarations and testimony presented an insufficient basis for new trial. The court impliedly found there was not "a substantial likelihood that the vote of one or more jurors was influenced by exposure to prejudicial matter" (*People* v. *Marshall, supra,* 50 Cal.3d at p. 950) and concluded the presumption of prejudice had been rebutted.[12] Considering the inconsistencies in and consequent weakness of the evidence of misconduct provided by the dissident jurors, and given the facts that the improper statements concerning penalty came from members of the jury, consisted at most of three isolated statements during two days of deliberations, were not represented as being based upon any special knowledge, were presented as merely probable, and were not of such a nature as would reasonably be relied upon given the seriousness of the crime charged, we agree with the trial court's assessment.

■ " ' "However strictly the decisions may lay down the rule as to the effect of misconduct of the jury that may well have prejudiced the parties, it

---

[11]Prior to her receipt of the penalty information Miller had voted either undecided or not guilty. When she changed her vote to guilty on the last written vote, this made it 10 for guilty and 2 undecided. There is no indication in the record of the time periods between the various votes or the makeup of the prior votes. Thus there is no reason to believe progress was not being made to change any of the three votes, or other votes, to guilty before the statements as to penalty were made.

[12]The dissent incorrectly states the trial court "conclud[ed] CALJIC No. 17.42 [jurors must not consider or discuss penalty or punishment] negated the impact of the jury's discussion and consideration of defendant's penalty." (Dis. opn., *post,* p. 43.) What the court said on that issue, and all that it said, follows: "We have got two separate questions which have been raised. And one is the question of consideration of penalty, the portion as to somebody in the jury room saying that six months was the penalty. [¶] With reference to that aspect, the Court specifically instructed the jury in the precise words of CALJIC 17.42, in which I said, 'In your deliberations the subject of the penalty or punishment is not to be discussed or considered by you. [¶] That is a matter which must not in any way effect [*sic*] your verdict.' [¶] I think that was quite clear. And the Court feels that whatever was said in the jury room in the this [*sic*] particular case, with what had been presented to the Court, should not be deemed by the Court a sufficient basis for granting of a new trial."

is settled in this state that a new trial will not be granted on that ground where the misconduct was of such a trifling nature that it could not in the nature of things have been prejudicial to the moving party, and that where it appears that the fairness of the trial has been in no way affected by such impropriety, the verdict will not be disturbed. . . ." [Citations.]' [Citation.]" (*People* v. *Miranda, supra,* 44 Cal.3d at pp. 117-118.)

The judgment is affirmed.

Sparks, J., concurred.

**NICHOLSON, J.,** Concurring and Dissenting.—I agree with the majority's conclusion there was no error in the trial court's response to the jury's request for clarifying instructions. I also share the majority's aversion to overturning verdicts for trifling misconduct. However, the unusual facts of this case raise serious questions about what occurred during jury deliberations.

In my view, several jurors discussed and considered potential penalty in violation of the trial court's express instruction (CALJIC No. 17.42).[1] This constituted presumptively prejudicial misconduct which was not rebutted by the prosecution. Further, the prosecution failed to perfect its objection to the subjective statements contained in several jurors' declarations and live testimony. This permitted the trial court to consider that evidence in its entirety. Consequently, it is unnecessary to consider defendant's contention article I, section 28, subdivision (d),[2] added to the California Constitution by Proposition 8, abrogates Evidence Code section 1150.[3] Having concluded the trial court abused its discretion in denying defendant's new trial motion, I would reverse.

Before explaining my reasons for these conclusions, I highlight facts relevant to the question of jury misconduct:

The jury retired to deliberate at 1 p.m. on April 20, 1988, and returned its verdict of guilty of conspiracy to commit first degree murder at 2:40 p.m. on

---

[1]The court instructed the jury: "In your deliberations the subject of penalty or punishment is not to be discussed or considered by the jury. That is not [*sic*] a matter which must not in any way affect your verdict."

[2]"Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, *relevant evidence shall not be excluded in any criminal proceeding,* including pretrial and post conviction motions and hearings, or in any trial or hearing of a juvenile for a criminal offense, whether heard in juvenile or adult court. Nothing in this section shall affect any existing statutory rule of evidence relating to privilege or hearsay, or Evidence Code, Sections 352, 782 or 1103. Nothing in this section shall affect any existing statutory or constitutional right of the press." (Italics added, see also Evid. Code, § 351.)

[3]All statutory references are to the Evidence Code unless otherwise indicated.

April 22. On the second day of deliberations, the jury requested clarification of definitions for "conspiracy" and "overt act." The trial court responded the following morning.

Defendant's motion for new trial included declarations from three jurors. In two of them, Jurors Charlet Manjeot and Jean Passmore said the last written vote was ten for a guilty verdict versus two for undecided. Before the last written ballot and the final verbal vote, Juror Miller heard an unidentified juror say defendant would receive a sentence of only six months for what he had done.[4] Manjeot heard a similar statement from an unidentified juror between the last written vote and the verbal vote. While Miller was trying to convince Passmore to convict, she repeated the information on penalty to Passmore.

In response to the new trial motion, the prosecutor maintained the juror declarations regarding the six-month sentence reflected the jurors' subjective mental processes and were, therefore, inadmissible. The prosecutor also supplied declarations in which the remaining nine jurors said they heard no mention of the six-month penalty in the course of jury deliberations. There was no motion to strike all or part of the Manjeot, Passmore, and Miller declarations.

The trial court permitted Manjeot and Passmore to testify at the hearing on defendant's new trial motion. The prosecutor repeatedly objected and argued the testimony constituted inadmissible evidence of subjective thought processes. In each instance, the trial court admitted all the evidence subject to a motion to strike to be made after testimony and argument were completed. However, the prosecutor did not, thereafter, make such a motion to strike. The trial court ruled on defendant's new trial motion, declaring:

"We have got two separate questions which have been raised. And one is the question of consideration of penalty, the portion as to somebody in the jury room saying that six months was the penalty.[5]

"With reference to that aspect, the Court specifically instructed the jury in the precise words of CALJIC 17.42, in which I said, 'In your deliberations the subject of the penalty or punishment is not to be discussed or considered by you.

"That is a matter which must not in any way [a]ffect your verdict.'

---

[4]Defendant faced a sentence of 25 years to life on the conspiracy count alone. (Pen. Code, §§ 182, 190.)

[5]The second question related to defendant's contention the verdict was not unanimous, an issue not raised on appeal.

"I think that was quite clear. And the Court feels that whatever was said in the jury room in . . . this particular case, with what had been presented to the Court, should not be deemed by the Court a sufficient basis for the granting of a new trial." The court made no findings of fact concerning the weight of the evidence or credibility of witnesses.

The trial court erred in concluding CALJIC No. 17.42 negated the impact of the jury's discussion and consideration of defendant's penalty. Although an appropriate admonition may eliminate potential prejudice where a trial court receives prompt notice of jury misconduct (see *People* v. *Harper* (1986) 186 Cal.App.3d 1420 [231 Cal.Rptr. 414], and *People* v. *Underwood* (1986) 181 Cal.App.3d 1223 [226 Cal.Rptr. 840]), it is not effective when, as here, breach of an instruction constitutes misconduct which is not revealed until after the jury returns its verdict. I conclude there is no other basis on which to affirm this judgment.

I

*The Prosecution Failed to Perfect the Section 1150 Objection*

The Manjeot, Passmore, and Miller declarations included evidence of "statements made, or conduct, conditions, or events occurring, . . . within . . . the jury room" as well as evidence "[showing] the effect of such statement, conduct, condition, or event upon a juror . . . ." (§ 1150.) The prosecutor's failure to renew his motion to strike evidence of subjective thought processes left all the evidence supplied by Manjeot, Miller, and Passmore before the trial court.

When evidence is received subject to a later motion to strike, the motion to strike is mandatory. If it is not made, the objecting party waives its objections to admission of that evidence. (*Ault* v. *International Harvester Co.* (1974) 13 Cal.3d 113, 123 [117 Cal.Rptr. 812, 528, 1148, 74 A.L.R.3d 986] [no motion to strike after conditional admission of hearsay testimony about another witness's observation of defects in vehicle]; *Estate of Wempe* (1921) 185 Cal. 557, 564 [197 P. 949] [no motion to strike after tentative admission of physician's testimony concerning decedent's mental competency in a will contest]; *People* v. *Cook* (1905) 148 Cal. 334, 344 [83 P. 43] [no motion to strike after conditional admission of testimony concerning defendant's incestuous relationship with his daughter]; 1 Cal. Procedure During Trial (Cont.Ed.Bar 1982) § 11.19, p. 455.)

Similarly, when a trial court, through inadvertence or neglect, fails to rule or to reserve its ruling, "the party who objected must make some effort to

have the court *actually rule*. If the point is not pressed and is forgotten, he may be deemed to have waived or abandoned it, just as if he had failed to make the objection in the first place." (3 Witkin, Cal. Evidence (3d ed. 1986) Introduction of Evidence at Trial, § 2030, p. 1992, italics in original; see also *People* v. *Rhodes* (1989) 212 Cal.App.3d 541, 554 [261 Cal.Rptr. 1] [failure to secure rulings on motions for transcript of voir dire and authorization of investigative fees waived issues on appeal]; *People* v. *Obie* (1974) 41 Cal.App.3d 744, 750 [116 Cal.Rptr. 283], overruled on another ground in *People* v. *Rollo* (1977) 20 Cal.3d 109, 120, fn. 4 [141 Cal.Rptr. 177, 569 P.2d 771] [failure to secure ruling on Penal Code section 995 motion waived issued on appeal]; and *People* v. *Staver* (1953) 115 Cal.App.2d 711, 724 [252 P.2d 700] [failure to rule on admission of documentary evidence waived issue on appeal].)

Whether applied in situations involving conditional admission of evidence pending further proof or admission of evidence subject to a later ruling on the objection, the rule is the same. In both criminal and civil cases, the burden is placed on the objecting party to renew the objection by means of a motion to strike *and to obtain a ruling on that motion*. (McCormick on Evidence (3d ed. 1984) § 58, p. 150; Annot., Evidence—Renewal of Objection (1959) 88 A.L.R.2d 12, 22, § 3[d].) This is especially true where the trial court admits evidence and invites objecting counsel, here the prosecutor, to make a motion to strike later.

Two practical consequences arise from enforcement of a waiver in these circumstances. The first consequence is relevant to the question before us. Absent a motion to strike, the challenged evidence is properly before the trier of fact. The second consequence, waiver of the evidentiary issue on appeal, is not at issue.

If the objector fails to make a record, the factual basis for the trial court's ruling may be left unclear, if not entirely omitted. As a result, a reviewing court may draw incorrect inferences in support of the ruling, if it can address the matter at all.

Here, the trial court may have based its denial of the new trial motion on the objective testimony alone. Alternatively, it may have considered both subjective and objective evidence coming from Jurors Manjeot, Miller, and Passmore. Given the prosecution's failure to perfect its objection to evidence of the jurors' subjective mental processes, this court can only assume *both* objective and subjective evidence were properly before the trial court at the

time of its ruling. At oral argument on appeal, the Attorney General conceded all the evidence was before the trial court.[6]

## II

### *The Prosecution Did Not Rebut the Presumption of Prejudice*

Penal Code section 1181 authorizes a trial court to grant a motion for new trial "[w]hen the jury has . . . been guilty of any misconduct by which a fair and due consideration of the case has been prevented; . . ." (Pen. Code, § 1181, subd. 3.) Misconduct exists in a variety of forms. Well-established rules guide the court in determining whether a particular case of misconduct warrants a new trial.

Juror misconduct raises a presumption of prejudice. (*People* v. *Daniels* (1991) 52 Cal.3d 815, 864 [277 Cal.Rptr. 122, 802 P.2d 906]; *People* v. *Stankewitz* (1985) 40 Cal.3d 391, 402 [220 Cal.Rptr. 382, 708 P.2d 1260].) "It is settled that 'unless the prosecution rebuts that presumption by proof that no prejudice actually resulted, the defendant is entitled to a new trial.' " (*Ibid.*) The likelihood of rebutting the presumption of prejudice is "far less" where, as here, "the offending juror remains on the jury and participates in the verdict than when the juror is promptly removed." (*People* v. *Daniels, supra,* 52 Cal.3d at p. 864.)

Whether the presumption of prejudice raised by juror misconduct is rebutted by the prosecution must be resolved through the analysis set forth in *People* v. *Marshall* (1990) 50 Cal.3d 907 [269 Cal.Rptr. 269, 700 P.2d 676]. "A judgment adverse to a defendant in a criminal case must be reversed or vacated 'whenever . . . the court finds a substantial likelihood that the vote of one or more jurors was influenced by exposure to prejudicial matter relating to the defendant or to the case itself that was not part of the trial record on which the case was submitted to the jury.' (2 ABA Standards for Criminal Justice, std. 8-3.7 (2d ed. 1980) p. 8.57 [additional citations omitted].)" (*Id.* at pp. 950-951.)

" 'The ultimate issue of influence on the juror is resolved by reference to the substantial likelihood test, an objective standard. In effect, the court must examine the extrajudicial material and then judge whether it is inherently

---

[6]Thereafter, this court asked the parties to provide supplemental briefing on questions unrelated to waiver.

likely to have influenced the juror.' (2 ABA Standards for Criminal Justice, *supra*, std. 8-3.7, Commentary, p. 8.58.)" (50 Cal.3d at p. 951.)[7]

The *Marshall* court elaborated on the substantial likelihood test, and emphasized " 'prejudice analysis' is different from, and indeed less tolerant than, 'harmless-error analysis' for ordinary error at trial. The reason is as follows. Any deficiency that undermines the integrity of a trial . . . introduces the taint of fundamental unfairness and calls for reversal *without consideration of actual prejudice*. (See *Rose* v. *Clark* [1986] 478 U.S. [570,] 577-578 [92 L.Ed.2d 460, 106 S.Ct. 3101].) Such a deficiency is threatened by jury misconduct. *When the misconduct in question supports a finding that there is a substantial likelihood that at least one juror was impermissibly influenced to the defendant's detriment, we are compelled to conclude that the integrity of the trial was undermined: under such circumstances, we cannot conclude that the jury was impartial*." (50 Cal.3d at p. 951, italics added.)[8]

Misconduct occurred in various forms during these jury deliberations. "[CALJIC No. 17.42] directs the jury not to involve the question of guilt with a consideration of the penalty. That is the law. Without that advice a jury may permit its consideration of guilt to be deflected by a dread of seeing the accused suffer the statutory punishment." (*People* v. *Shannon* (1956) 147 Cal.App.2d 300, 306 [305 P.2d 101].) The evidence shows several jurors discussed and considered penalty during deliberations.

In addition, several jurors disregarded the trial court's admonition to follow the law as stated by the court (CALJIC No. 1.00 (4th ed. 1979)), not be "swayed by . . . conjecture" (CALJIC No. 1.00, *supra*), and to "decide all questions of fact . . . from the evidence received . . . and not from any other source" (CALJIC No. 1.03 (4th ed. 1985 pocket pt.)).

---

[7]The majority misreads this portion of *Marshall* as limiting the court's inquiry to the nature of the extrajudicial material. A court may also consider the impact of the extraneous material. (See, e.g., *Glage* v. *Hawes Firearms Co.* (1990) 226 Cal.App.3d 314, 321-326, 328 [276 Cal.Rptr. 430] [applied *Marshall* analysis, and reversed judgment where there was a dramatic shift in jury votes after discussion of the word "preponderance"].) The majority itself believes timing of the extraneous information is a factor to consider. (See fn. 9, *post*, p. 48.)

[8]Although the majority correctly states the presumption of prejudice applies in both civil and criminal cases, civil and criminal cases require different approaches to the question whether that presumption has been rebutted. An express agreement by the jurors to consider evidence of insurance in their verdict may be required to establish jury misconduct in a civil case. (See *Gorman* v. *Leftwich* (1990) 218 Cal.App.3d 141, 147 [266 Cal.Rptr. 671], and *Moore* v. *Preventive Medicine Medical Group, Inc.* (1986) 178 Cal.App.3d 728, 740 [223 Cal.Rptr. 859], cited by the majority.) However, "[a] strict rule that one tainted juror compels reversal is necessary in criminal cases because under the California Constitution, the jury must unanimously agree that a defendant is guilty." (See *Glage* v. *Hawes Firearms Co., supra*, 226 Cal.App.3d at p. 322.)

"[T]he introduction of extraneous law, whether erroneous or not, constitutes misconduct." (*People* v. *Marshall, supra*, 50 Cal.3d at p. 950; see *People* v. *Honeycutt* (1977) 20 Cal.3d 150 [141 Cal.Rptr. 698, 570 P.2d 1050]; *In re Stankewitz, supra*, 40 Cal.3d 391; and *People* v. *Karis* (1988) 46 Cal.3d 612 [250 Cal.Rptr. 659, 758 P.2d 1189].) "Jurors are not allowed to obtain information from *outside sources* either as to factual matters or for guidance on the law." (*People* v. *Karis, supra*, at p. 642, italics added.) Clearly, jurors may not generate information or law from *inside sources* either. It is both the nature *and* impact of the information from outside the record, *rather than its source*, which is definitive here. (See *Glage* v. *Hawes Firearms Co., supra*, 226 Cal.App.3d 314 [reference to dictionary definition of "preponderance" followed by a dramatic shift in votes resulted in reversal].)

Another concern arises from discussion of penalty or introduction of extraneous law or fact. A juror's duty "includes the obligation to follow the instructions of the court, and a judge may reasonably conclude that a juror who has violated instructions to refrain from discussing the case or reading newspaper accounts of the trial cannot be counted on to follow instructions in the future." (*People* v. *Daniels, supra*, 52 Cal.3d at p. 865.)

The prosecution made a two-pronged attack on defendant's allegations of jury misconduct. First, the prosecution referenced declarations in which nine jurors stated they had not heard any discussion of a six-month sentence during deliberations. This purported to establish nothing improper happened. Second, the prosecution argued juror statements as to penalty "were not prejudicial even if they were admissible" because (1) they "were not made with any apparent authority" and (2) the trial court read the jury CALJIC No. 17.42. At no time did the prosecution acknowledge its responsibility to rebut the presumption of prejudice, nor does the Attorney General here.

The majority concludes the prosecution rebutted the presumption of prejudice because the evidence of misconduct was weak, came from members of the jury, involved "three isolated statements during two days of deliberations," was not presented as authoritative but "merely probable," and was "not of such a nature as would reasonably be relied upon given the seriousness of the crime charged."

Objective reasonableness of the extraneous information is not the standard for determining whether misconduct warrants reversal. (See *People* v. *Marshall, supra*, 50 Cal.3d at pp. 950-951.) Furthermore, the emphasis on authoritativeness of the extraneous information discounts the legal imperative to insulate jurors from extraneous information or law, from whatever source.

The objective facts show the jury stood at 10 to 2 for conviction before the extraneous information was introduced into the jury room. Two jurors heard an unidentified juror say defendant would probably only get six months for what he had done. One of those two jurors, Miller, attempted to persuade an undecided juror, Passmore, to vote guilty. In trying "to convince Jean Passmore to change her vote," Miller pointed out defendant had committed one of the overt acts and stated he "would probably only get six months for what he had done, in reference to the conspiracy charge." Shortly thereafter, Passmore changed her undecided vote, and the jury reached a unanimous verdict on a verbal vote. Passmore testified the information about the likely penalty caused her to change her vote.

Objective evidence demonstrates the jury votes changed between the last written vote and the last verbal vote.[9] There is nothing express or implied in the trial court's ruling to suggest it questioned the credibility of the three jurors who submitted declarations and testimony in support of defendant's motion for new trial. Here the use of the extraneous information in an attempt to change a vote, and the temporal proximity of the misconduct to the vote change, support the conclusion "at least one juror was impermissibly influenced to the defendant's detriment." (*People* v. *Marshall, supra,* 50 Cal.3d at p. 951.)

"[T]he introduction of extraneous law, whether erroneous or not, constitutes misconduct." (*People* v. *Marshall, supra,* 50 Cal.3d at p. 950.) The extraneous information here involved a matter of law, that is, the potential penalty. It was not only extraneous, it was grossly erroneous. (See fn. 4 *ante,* p. 42.) Furthermore, the information was received, discussed, and considered, willfully and in direct violation of and disregard for the trial court's instructions. (See fn. 1 *ante,* p. 41.) The information was, in fact, repeated by Miller *in an effort to convince Passmore to change her vote.*

Writing for a unanimous court in *People* v. *Holloway,* Justice Panelli declared: "Defendant was entitled to be tried by 12, not 11, impartial and unprejudiced jurors. 'Because a defendant charged with crime has a right to the unanimous verdict of 12 impartial jurors [citation], it is settled that *a conviction cannot stand if even a single juror has been improperly influenced.*' " (50 Cal.3d at p. 1112, quoting *People* v. *Pierce* (1979) 24 Cal.3d 199, 208 [155 Cal.Rptr. 657, 595 P.2d 91], italics added.)

[9]The majority states "the record is silent as to when during the 49 hours between the start and finish of deliberations the statements concerning penalty were made or the votes were taken. The final vote may have been taken well after the statements were made and following substantial discussion among the jurors of matters properly before them." (Maj. opn., *ante,* p. 39.) The only reasonable inference is the jury took the "last" written vote and the "last" verbal vote much closer to the end of deliberations than the beginning.

I do not find the prosecution's declarations and arguments sufficient to rebut the presumption of prejudice. Far from rebutting that presumption, the nine juror declarations submitted by the prosecution suggest additional jury misconduct in the form of enclave deliberations.

Although the statements concerning defendant's probable penalty may not have been made with any apparent authority, I do not view that fact as critical in this case. In assessing jury misconduct, the *type* of data may be as relevant as the *source*. Here, the fact the information was repeated suggests at least one juror gave that information some credence. Passmore did, in fact, change her undecided vote to guilty shortly after Miller told her defendant would only get six months in jail.

I find the record reflects a substantial likelihood extraneous and erroneous information about defendant's penalty impermissibly influenced at least one juror to change her vote. Thus, I conclude the trial court abused its discretion in denying the new trial motion and would reverse.

### III

*Section 1150 Excludes Evidence for Reasons Apart From Relevance*

Perhaps most perplexing is the rationale by which the majority justifies its conclusion evidence of a juror's subjective reasoning process is immaterial, and therefore irrelevant, to a challenge to the validity of a verdict. That conclusion forms the basis for the majority's rejection of defendant's contention article I, section 28, subdivision (d) of the California Constitution nullifies section 1150, a question the majority need not reach. The majority's analysis of materiality and relevance also pertains to the type of evidence a court may consider on the question of jury misconduct in the absence of a motion to strike.

I have no quarrel with the majority's assumption "relevant evidence" in California Constitution article I, section 28, subdivision (d), means the same as "relevant evidence" in section 210. Nor do I question its conclusion section 210 encompasses "materiality" in its description of "relevance."[10] At the same time, I believe the majority's application of section 1150 ignores both the plain language of the statute and its common law origins. Simply

---

[10]"While there is no universal test of relevancy, the general rule in criminal cases might be stated as whether or not the evidence tends logically, naturally, and by reasonable inference to establish any fact material for the prosecution or to overcome any material matter sought to be proved by the defense. [Citation.] Evidence is relevant when no matter how weak it may be, it tends to prove the issue before the jury." (*People* v. *Slocum* (1975) 52 Cal.App.3d 867, 891 [125 Cal.Rptr. 442].) Concerns regarding the reliability of such evidence go to its weight.

put, section 1150 excludes relevant and material evidence for policy reasons quite apart from relevancy and materiality.

Section 1150 begins, "Upon an inquiry as to the validity of a verdict, *any otherwise admissible evidence*" may be received or not received as specified. (Italics added.) Because only relevant evidence is admissible (§ 350), "otherwise admissible evidence" refers to relevant evidence. Section 1150 then declares a statutory exclusionary rule: "No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."

I cannot agree with the majority's characterization of section 1150 as "delimiting the *issues* 'upon an inquiry as to the validity of the verdict.' " (Italics added.) Section 1150 merely limits *facts* that may be proved to impeach a verdict. (*People* v. *Hutchinson* (1969) 71 Cal.2d 342, 349 [78 Cal.Rptr. 196, 455 P.2d 132], cert. den. 396 U.S. 994 [24 L.Ed. 457, 90 S.Ct. 491].) Evidence of "overt facts, objectively ascertainable" is admissible; evidence of "the subjective reasoning processes of the individual juror" is not. (*Ibid.*)

The statute excludes evidence of mental processes for public policy reasons. Indeed, such evidence may be excluded because it is too material and too probative of the question of jury misconduct. In *Hutchinson*, the Supreme Court rejected the view section 1150 involved the balancing of two *conflicting* policies—the need " 'to prevent instability of verdicts, fraud, and harassment of jurors,' " and the desire " 'to give the losing party relief from wrongful conduct by the jury.' " (*Id.* at p. 348.) Instead, the Supreme Court concluded "there is no substantial conflict of policies and that the wrong to the individual cannot be considered the lesser of two evils." (*Id.* at p. 349.)

Thus, the majority's lengthy discussion of rule 606(b) of the Federal Rules of Evidence (28 U.S.C.) does no more than confirm what was also stated in *Hutchinson*: there are valid policy reasons for excluding some types of evidence offered to prove jury misconduct. Given shared common law roots, it is not surprising the same policy considerations provide the basis for both the federal and state rules.

In cases involving claims of jury misconduct, the relevancy and materiality of evidence are determined by the substantive questions we have already discussed, not by section 1150. First, has the jury been guilty of misconduct by which a fair and due consideration of the case has been prevented? (Pen. Code, § 1181, subd. 3.) Second, is there evidence of misconduct which gives

rise to the presumption of prejudice? Third, is the prosecution evidence sufficient to rebut the presumption of prejudice, or, is there "a substantial likelihood that at least one juror was impermissibly influenced to the defendant's detriment"? (*People* v. *Marshall, supra,* 50 Cal.3d at p. 951.) A juror's subjective reasoning process is relevant to these questions.

There may be other grounds upon which to reject defendant's argument article I, section 28, subdivision (d), of the California Constitution nullifies section 1150. However, I cannot agree with the analysis offered by the majority.

A petition for a rehearing was denied February 25, 1992, and appellant's petition for review by the Supreme Court was denied April 16, 1992.