Filed 9/10/13  P. v. Negroni CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | **E055247** |
| v. | **(Super.Ct.No. INF10001557)** |
| RALPH CHARLES NEGRONI, | **OPINION** |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Graham Anderson Cribbs, Judge.  (Retired judge of the Riverside Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Denise M. Rudasill, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Lilia E. Garcia, Lynne McGinnis, Felicity Senoski, and Linh Lam, Deputy Attorneys General, for Plaintiff and Respondent.

In early 2010, defendant Ralph Charles Negroni leased a house in Desert Hot Springs with his wife, Emilia Negroni. However, by June 2010, he had moved out of the residence into another apartment due to marital problems. On June 28, he came to the home and saw through a bedroom window Emilia using methamphetamine with another man in her bedroom. Defendant threw a rock through the window, entered the bedroom, and beat up Emilia.[1]

Defendant was convicted of first degree burglary (Pen. Code, § 459)[2] and corporal injury to a spouse (§ 273.5, subdivision (a)). The special allegation that someone other than an accomplice was present during the burglary (§667.5, subdivision (c)(21)) was found true. Defendant was granted three years of formal probation with 60 days in the custody of the Riverside County Sheriff's Department in the work program.

Defendant now contends on appeal as follows:

---

[1]     Since many of the witnesses and the defendant share the same last names, we refer to the witnesses by their first name for ease of reference and not out of disrespect to the witnesses.

[2]     All further statutory references are to the Penal Code unless otherwise indicated.

1.	The trial court erred and violated his federal constitutional rights to due process and to confront witnesses against him by admitting Emilia's hearsay statement made to a responding officer since she did not testify at trial and was therefore unavailable for cross-examination.

2.	His conviction of first degree burglary must be reversed for insufficiency of the evidence because he had a possessory interest in the home.

3.	The trial court violated his federal constitutional rights by excluding defense evidence.

We affirm the judgment.

I

FACTUAL BACKGROUND

A.	*People's Case-in-Chief*

Emilia and defendant were married. Emilia refused to testify at trial. Jessica Ortiz was Emilia's cousin. On June 28, 2010, Jessica had been living with her son at Emilia's house located on Foxdale Drive in Desert Hot Springs (the Foxdale house) for a "couple" of months. Defendant had moved out of the Foxdale house to a different apartment but would come visit the two children he had with Emilia.

Sometime around 10:00 p.m. on June 28, Jessica was giving her son a bath. A friend of Emilia's, who was identified as "Jessie," was also at the house but did not live

there. [3] Jessica had seen Emilia and Jessie in Emilia's bedroom together prior to giving her son a bath.

Jessica heard a loud crash. She then heard defendant and Emilia yelling at each other in Emilia's room. Jessica heard Emilia yell for defendant to stop. Emilia had her door locked so Jessica could not see what was happening or get the door open. Jessica never saw Jessie after this. Emilia emerged from the room and was bloody.

Jessica went to the front yard because she was afraid. She wanted to call the police but did not have a phone. Emilia emerged from the house and was covered in blood. Defendant was with her and was yelling at her to find his "stuff." Emilia was trying to get away from defendant. Defendant ran after her. Defendant grabbed Emilia's hair and threw her to the ground.

Defendant's cousin, Alejandro Ortiz, arrived at the house. Earlier that evening, Alejandro had seen cars at the Foxdale house belonging to people of whom he did not approve and whom he called "thieves." Alejandro went to defendant's apartment and told him that these people were at the house.

Alejandro insisted that when he arrived at the Foxdale house he did not to see any injuries to Emilia. Jessica observed Alejandro get between defendant and Emilia. Emilia went back in the house. Emilia was afraid that defendant would come back in the house and attack her.

---

[3] Jessica testified for the first time at trial that Jessie was at the house.

4

When the police arrived, Emilia had walked back outside and was near the garage. Defendant told Emilia not to say anything to the police. He told her that if he went to jail, she would go to jail.

Desert Hot Springs Police Captain David O'Dowd was on duty on June 28, 2010. Desert Hot Springs police received a 911 call with a female screaming in the background. No one spoke on the line but Captain O'Dowd was able to trace the call to the Foxdale house. When Captain O' Dowd arrived, he observed defendant and Emilia in front of the house.

Defendant had a laceration over his left eye, and his hand was bleeding. He immediately put his hands behind his back. Defendant told Captain O'Dowd that he injured his hand on the broken glass from the door. The wounds appeared to be caused by glass and not a fist fight. Defendant was handcuffed, and Deputy O'Dowd went to speak with Emilia. Emilia was crying. She had blood on her face and several facial injuries.

Captain O'Dowd asked Emilia what had happened. Emilia told Captain O'Dowd, "My husband beat me up." Based on this information and Emilia's injuries, he called an ambulance. Emilia was taken by ambulance to the hospital.

Captain O'Dowd searched the bedroom. He found a large rock on the floor in the bedroom. A window in the door leading to the outside was broken. There was glass and blood throughout the room. A small baggie containing what looked like

5

methamphetamine was lying on the bed. Emilia was uncooperative and would not tell Captain O'Dowd who the other male was in the house.

Defendant voluntarily spoke with Captain O'Dowd at the scene. He told Captain O'Dowd that his apartment had been burglarized the prior night, and he came to Emilia's house to see if any of his property was at the location. He arrived and looked in the bedroom window. He observed Emilia smoking "crack" with another male. Defendant said that he "lost it" and threw a rock through the window. He told Captain O'Dowd that he "fucked up" and hit Emilia.

Defendant was arrested and transported to the police station. At the station, defendant told Captain O'Dowd again that he had broken the window and then hit Emilia. Defendant did not know how his face got cut. Defendant never claimed at the scene or at the police station that the male in the bedroom had attacked or hit him. Defendant never claimed that he lived in the Foxdale house.

Captain O'Dowd recalled that he had responded to the burglary reported by defendant. A laptop and some guns had been stolen from defendant. Captain O'Dowd saw Emilia the next day. Her nose was swollen, she had lacerations, and both of her eyes were black and blue.

Jessica did not pay rent on the Foxdale house. She moved out the day following the incident. Jessica did not want to testify against defendant because she cared for him. The parties stipulated that defendant and Emilia entered into a lease agreement for the

Foxdale house on March 2, 2010. The period of the lease was from April 1, 2010, to March 31, 2011.

B.    *Defense*

Defendant moved out of the Foxdale house because they were having marital problems. By June 28, he had been living in another apartment for a "[c]ouple" of months. Defendant kept "possessions" at the Foxdale house, he still had keys, and he went over to the house to see his children and to have meals. He claimed that he and Emilia were still engaging in sexual relations.

On June 27, 2010, sometime while he was at work, his apartment was broken into. His television, laptop, and guns were missing. Captain O'Dowd responded to his report of the incident.

On June 28, defendant had the two children at his apartment. Alejandro came to defendant's apartment and told him there were some "bad people" at the Foxdale house. Alejandro told him they were people who burglarized homes. Defendant went to the Foxdale house around 9:00 or 10:00 p.m. He saw several unfamiliar cars in the driveway. He went to the back of the house. He did not enter the house in the front because he thought if he knocked on the door, the inhabitants would conceal what was going on in the house.

Defendant looked into the living room window and saw three males and one female he did not recognize. One of the males and Emilia went into the master bedroom. Defendant went to the master bedroom door. He observed Emilia lock the inside door to

7

the bedroom.  The male had a pipe and a lighter and was about to smoke the pipe when Emilia took the pipe from him.  The male pushed her.  At that point, defendant threw a rock through the bedroom window.

Defendant put his hand through a hole the rock made and unlocked the door. Defendant did not use his key because the bedroom door did not have a keyed entry from the outside.  As defendant entered, the male rushed at him and hit him in the face.  They started fighting.  Defendant's eye was cut.  Emilia tried to break up the fight.  Defendant started swinging "wildly."  Defendant believed at some point during the fight he accidentally hit Emilia.

Emilia eventually ran out the door.  The male also ran out the door.  Defendant chased after Emilia, yelling at her for being with another man, using drugs, and being involved in taking the items from his apartment.  Emilia promised to call the person who had the items.  Emilia was looking for her telephone, and defendant kept following her. He said nothing about her bleeding or being hurt.

Emilia then apologized to defendant.  She then threatened that if the male who was with her got in trouble, defendant would never see his children again.  Defendant took the threat seriously.  He did not want his children living with her in a "drug-infested house . . . ."  At one point, Emilia started to walk away from defendant; he grabbed her collar, and she fell to the ground.  He did not throw her to the ground.

8

Defendant admitted he told Captain O'Dowd that night that he had beat up

Emilia. Defendant lied to Captain O'Dowd because he was afraid Emilia was going to

take the children away if her "friend" got in trouble.

## II

## VIOLATION OF FEDERAL CONSTITUTIONAL RIGHT

## TO CONFRONT WITNESSES

Defendant contends on appeal that his right to confront the witnesses against him

under the federal Constitution and as stated in *Crawford v. Washington* (2004) 541 U.S.,

was violated by the admission of a statement made by Emilia (who did not testify at trial)

to Captain O'Dowd that defendant beat her up.

A.      *Additional Factual Background*

Emilia was called to testify at the preliminary hearing and refused to testify. Prior

to trial, on October 13, 2011, the People notified the trial court that Emilia was unwilling

to testify pursuant to Code of Civil Procedure section 1219, subdivision (b).[4] The trial

court found that Emilia was an unavailable witness.

The prosecutor at trial asked Captain O'Dowd what Emilia had told him had

happened to her. Defendant objected on hearsay grounds. The prosecutor stated,

"Present impression, your Honor." The objection was overruled. Captain O'Dowd

---

[4]      This section prohibits a trial court from compelling a victim of domestic violence to testify.

testified that she said, "My husband beat me up." Defense counsel orally brought a mistrial motion based on the inability to cross-examine Emilia. The trial court denied the motion.

Defendant filed a formal request for mistrial on October 14, 2011. He argued that admission of Emilia's statements to police violated *Crawford*. He argued the statements made by Emilia were testimonial because they alleged that defendant hit her. Defendant had no opportunity to confront her, and this violated his federal constitutional rights.

The trial court believed the issue came down to whether the statements were trustworthy or reliable. The trial court found Emilia's statements were excited utterances. They were not testimonial. The mistrial motion was denied.

B.    *Analysis*

"The confrontation clause of the Sixth Amendment to the United States Constitution bars the admission of out-of-court testimonial statements except when both the witness is unavailable *and* the defendant had a prior opportunity to cross-examine the witness. [Citation.]" (*People v. Banos* (2009) 178 Cal.App.4th 483, 494, citing to *Crawford v. Washington, supra,* 541 U.S. at pp. 61-68.) In *Davis v. Washington* (2006) 547 U.S. 813, 817, the United States Supreme Court clarified what is meant by testimonial statements. It explained: " . . . Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is

10

no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Id.* at p. 822, fn. omitted.)

The United States Supreme Court recently addressed the issue again and stated that "not all 'interrogations by law enforcement officers' [citation], are subject to the Confrontation Clause." (*Michigan v. Bryant* (2011) ___ U.S. ___ [131 S.Ct. 1143, 1153, 179 L.Ed.2d 93], fn. omitted.) The California Supreme Court in *People v. Blacksher* (2011) 52 Cal.4th 769, 814, interpreted *Bryant* to provide that the following factors should be considered in determining the primary purpose with which a statement is given by the declarant or obtained by law enforcement:

"(1) The court must objectively evaluate the circumstances of the encounter along with the statements and actions of the parties. In this latter regard, 'the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions' in the given situation. [Citation.] [¶] . . . [¶]

"(2) The court should consider whether an '"ongoing emergency"' exists, or appears to exist, when the statement was made. Such an ongoing emergency focuses the participants on something other than obtaining evidence for trial. [Citation.] Again, the analysis is objective. Even if hindsight reveals that an emergency did not, in fact, exist, if it reasonably appeared to exist based on the information known when the statement was made the emergency test is satisfied. [Citation.] [¶] . . . [¶]

11

"(3) Whether an ongoing emergency exists is a 'highly context-dependent inquiry.' [Citation.] Even when a threat to an initial victim is over, a threat to first responders and the public may still exist. The type of weapon involved may expand or limit the duration and scope of the emergency. A situation created by the use of fists may involve less ongoing danger than the use of a firearm. [Citation.]

"(4) The medical condition of the declarant is a relevant consideration, as it bears on both the injured declarant's purpose in speaking and the potential scope of the emergency. [Citation.] As the high court describes it, the declarant's medical condition 'sheds light on the ability of the victim to have any purpose at all in responding to police questions and on the likelihood that any purpose formed would necessarily be a testimonial one.' [Citation.]

"(5) A nontestimonial encounter addressing an emergency may evolve, converting subsequent statements into testimonial ones. A real or apparent emergency may resolve itself. The disarming or capture of a perpetrator may end the danger. It may become clear from the declarant's and officer's statements or behavior that the focus has shifted from meeting the emergency to obtaining evidence for trial. [Citation.]

"(6) Finally, regardless of the existence of an emergency, the informality of the statement and the circumstances of its acquisition are important considerations." (*People v. Blacksher, supra,* 52 Cal.4th at pp. 813–815.)

"On appeal, we independently review whether a statement was testimonial so as to implicate the constitutional right of confrontation. [Citation.]" (*People v. Nelson* (2010) 190 Cal.App.4th 1453, 1466.)

This case is similar to *People v. Saracoglu* (2007) 152 Cal.App.4th 1584. In that case, the victim came to the police station after her husband choked her, pushed her, hit her, and threatened to kill her if she called the police. (*Saracoglu,*. at pp. 1587, 1598.) In determining whether the victim's statements at the police station regarding the beating should be admitted at trial, the court concluded that, "[f]aced with an obviously distraught woman, who was crying, shaking and very afraid, [the officer's] primary purpose was to ascertain what was going on. In doing so, [he] elicited the information he needed to understand [the victim's] situation and to take action 'to *resolve* the present emergency.' [Citation.] These circumstances show the primary purpose of [the officer's] interrogation was not to 'establish or prove past events potentially relevant to a later criminal prosecution' [citation], but rather 'to enable police assistance to meet an ongoing emergency' [citation] . . . . [¶] [The victim's] account to [the officer] of having been assaulted and threatened by [the defendant] was nontestimonial within the meaning of *Davis*, and therefore its admission at [the defendant's] trial was not a confrontation clause violation." (*Id.* at p. 1598.)

Here, the Desert Hot Springs Police Department received a 911 call wherein no one spoke, and a woman was heard screaming. The call was traced to the Foxdale house. When Captain O'Dowd arrived, he observed Emilia and defendant in front of the house.

13

Emilia was bleeding and had lacerations on her face. Defendant had a cut on his eye, and his hands were bloody. Emilia was crying. Defendant immediately put his hands behind his back and was handcuffed.

Despite defendant being placed in handcuffs, at that point, Captain O'Dowd was unaware what had occurred at the scene. Several cars were in the driveway. Jessica and Alejandro were at the house. Emilia was bleeding. It was unclear if other persons were involved. At that time, viewed objectively, Captain O'Dowd could be concerned there was an ongoing emergency. He quickly asked Emilia what had happened, and no follow-up questions were asked.

Taking into account the factors set out in *Bryant,* the statement made by Emilia that defendant had beat her up was not testimonial. Captain O'Dowd could reasonably consider that there was an ongoing emergency and could inquire of the victim what had happened in order to assess what further action needed to be taken. As such, Emilia's statement to Captain O'Dowd did not constitute testimonial hearsay and was properly admitted by the trial court.

Defendant contends there was no ongoing emergency because defendant put his hands behind his back and was handcuffed prior to the inquiry by Captain O'Dowd. In hindsight, this may be true. However, even if hindsight reveals that an emergency did not exist, if it reasonably appeared to exist based on the information known when the statement was made, the emergency test is satisfied. (*People v. Blacksher, supra,* 52 Cal.4th at p. 814.) Here, Captain O'Dowd was faced with Emilia, who was crying and

14

bleeding. Defendant had a cut and blood on his hands, and there several other cars and people at the house. Captain O'Dowd could reasonably be concerned that there was an ongoing threat.

Even if the trial court erred by admitting Emilia's statement to Captain O'Dowd, such error was harmless beyond a reasonable doubt. (*People v. Cage* (2007) 40 Cal.4th 965, 991-992; see also *Chapman v. California* (1967) 386 U.S. 18, 36; *People v. Banos, supra,* 178 Cal.App.4th at p. 504 [assessing admission of testimonial statement under harmless beyond a reasonable doubt standard].)

Here, other evidence established that defendant caused the injuries to Emilia. Jessica heard a loud crash and then heard Emilia telling defendant to stop. They then emerged from the bedroom, and Emilia was bleeding. Defendant chased after Emilia. He threw her to the ground. Jessie, the male who had been at the house, was no longer around. This was strong circumstantial evidence that defendant caused the injuries to Emilia.

Moreover, when Captain O'Dowd arrived, defendant immediately put his hands behind his back to be handcuffed. Defendant told Captain O'Dowd at the scene that he had seen Emilia in the bedroom with another man and "lost it." He admitted that he threw a rock through the window and rushed in. He admitted he hit Emilia. Defendant repeated the same story at the police station. Defendant's statements were consistent with the evidence at the scene.

15

Based on the evidence presented, even if Emilia's statement to Captain O'Dowd had been excluded, reversal would not be required.

III

SUFFICIENT EVIDENCE OF BURGLARY

Defendant contends that there was insufficient evidence that he committed first degree burglary because he had a possessory interest in the Foxdale house. He could not commit burglary at his own home.

"Our task is clear. 'On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence -- that is, evidence that is reasonable, credible, and of solid value -- from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] The standard of review is the same in cases in which the People rely mainly on circumstantial evidence. [Citation.] "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. '"If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment."' [Citations.]" [Citation.]' [Citations.] The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there

16

sufficient substantial evidence to support [the conviction].'"  [Citation.]"  (*People v. Cravens* (2012) 53 Cal.4th 500, 507-508.)

"Section 459 provides in pertinent part:  'Every person who enters any house, . . . with intent to commit grand or petit larceny or any felony is guilty of burglary.'  The statute retains two important aspects of common law burglary:  'the entry must invade a possessory right in the building and it must be committed by one who has no right to be in the building.  [Citation.]  Because the crime of burglary requires the invasion of a possessory right in a building, one cannot be found guilty of burglarizing one's own residence.'  [Citation.]"  (*People v. Gill* (2008) 159 Cal.App.4th 149, 158-159.)

In *People v. Gauze* (1975) 15 Cal.3d 709, 714, the Supreme Court confirmed that one cannot commit a burglary of his own home because he has a possessory right of habitation.  A burglary can be committed only by a person who does not have any right to be in the building.  In *Gauze*, defendant was a cotenant in the apartment in which the incident occurred and the Supreme Court reversed the burglary conviction due to his right of occupancy in the apartment.  (*Id*. at pp. 711, 715, 717.)[5]

Other cases have recognized that whether the accused has a possessory right in a property is a factual question to be resolved by the jury.  In *People v. Ulloa* (2009) 180

---

[5]　In line with this authority, the jury here was instructed as follows:  "A person cannot burglarize his or her own home as long as he or she has an unconditional possessory right . . . of entry. . . .   However, a family member who has moved out of the family home commits burglary if he or she makes an unauthorized entry with a felonious intent, since he or she has no claim of right to enter the residence."

17

Cal.App.4th 601 [Fourth Dist., Div. Two], the victim and the defendant were married, and both signed a lease for the apartment in which the incident occurred. However, there was substantial evidence presented that at the time of the incident the victim and defendant were separated, and the defendant was living elsewhere. (*Id.* at pp. 604-605, 607.) The appellate court rejected the defendant's contention that he could not be convicted of burglary because he was a tenant under the lease: "Here, there was evidence defendant and [the victim] were estranged and separated due to having serious marital problems; defendant had voluntarily moved out of the apartment; defendant had committed prior domestic violence against [the victim]; and [the victim] feared defendant. Also, because defendant yelled at [the victim] from outside the apartment at 5:00 a.m. and broke in, a reasonable inference could be drawn that defendant no longer had a key to the apartment and entered without [the victim's] consent, with intent to commit theft or some other crime. Under such circumstances there was sufficient evidence supporting a finding that defendant did not have an unconditional possessory interest in the apartment. We thus conclude the apartment lease did not constitute a complete defense to burglary and there was sufficient evidence supporting defendant's burglary conviction." (*Id*. at p. 610.)

In *People v. Davenport* (1990) 219 Cal.App.3d 885, the defendant and his wife lived in a cabin owned by the wife's parents, who also lived in the cabin. Defendant moved out but his wife continued to live there. The defendant returned his keys. He left some personal property at the cabin and was told by his wife to meet with her to pick it

18

up. He did not have permission to enter the cabin unaccompanied. However, defendant and a friend drove to the cabin to pick up his property when no one was there and broke in. They also took items belonging to the wife and the wife's mother. (*Id.* at pp. 887-889.) The defendant was convicted of burglary, and he appealed on the ground that he had an unconditional right to enter the cabin because his wife lived in the cabin. The court rejected his argument, finding that substantial evidence supported a conclusion that the defendant had no right, or at best, a conditional right, to enter the cabin. It relied on evidence that he and his wife had been separated for several months; the wife had no ownership interest in the cabin; the owner of the cabin had asked the defendant to return his keys, and he had done so; and his wife had told him not to pick up his personal property unless she was there. (*Id.* at p. 892.)

Although there was no evidence of prior incidents of spousal abuse, or expressed fear of defendant by Emilia as in *Ulloa*, the evidence did support that defendant and Emilia were estranged at the time of the incident. Defendant not only had moved out, Jessica had moved into the house two months prior to this incident. Defendant had leased another apartment. Despite the fact that defendant may have visited the house to see his children and maybe have had sexual relations with Emilia, there was no evidence he had a right to be in the house uninvited or when Emilia was not present. Defendant, despite claiming to have a key, broke through a window to gain access. Based on the foregoing, the jury reasonably could conclude that defendant did not have an unconditional right to enter the Foxdale house.

19

Moreover, although not discussed by the parties, defendant did not have a key to the bedroom door. He observed that Emilia locked the door to the bedroom on the inside, and Jessica testified that the inside door to the bedroom had a deadbolt. Even if defendant had some possessory interest in the house, he certainly could not reasonably believe that he had a right to enter the bedroom of his estranged wife when she locked both doors to the room. He threw a rock through a window to gain access to the bedroom, the only possible access to the bedroom. In *People v. Abiliez* (2007) 41 Cal.4th 472, a case upholding a conviction for burglary of a room in a house in which the defendant resided, the court held, "The jury could have concluded that, under the circumstances, defendant at that time lacked the victim's consent to enter her bedroom; that he may have had a possessory right to enter the home does not preclude a conviction for burglary on these facts." (*Id.* at p. 509.) Defendant entered the home through the master bedroom to which he had no operable key. The inside door was locked which would prevent entry to the room if he had entered the house. The jury reasonably could conclude he did not have a right to enter Emilia's bedroom.

Sufficient evidence supported that defendant no longer had an unconditional right to enter the Foxdale house at the time that he committed the corporal injury to Emilia. As such, he was properly convicted of first degree burglary.

IV

EXCLUSION OF DEFENSE EVIDENCE

Defendant claims that the exclusion of evidence that he sought to admit in his defense violated his federal constitutional rights. First, he contends the trial court should have allowed him to introduce evidence that he was paying rent on the Foxdale house to show he had a possessory interest in the house. Second, he claims he should have been allowed to introduce evidence pertaining to Emilia coming to his home after the incident and feigning that defendant injured her.

A.      *Additional Factual Background*

Defendant attempted to introduce evidence that he was paying rent on the Foxdale house even after he moved to another apartment. He first testified that he was legally evicted from the Foxdale house. Counsel then asked defendant, "[W]ho was responsible for paying the rent on that residence?" Defendant responded "I was." The trial court interrupted and stated, "Counsel, that calls for a legal conclusion. They are both on the lease. They are both jointly responsible for it. Okay? [¶] Thank you. Move on." Counsel then asked if Emilia was employed in June 2010, to which defendant responded she was not. Counsel also asked who was generating income in the family. The trial court again interjected, "Counsel, the Court is going to interject its own objection. That is entirely inappropriate and irrelevant to what's going on here. Thank you."

During cross-examination of Jessica, defense counsel questioned her about events that occurred when Emilia visited Jessica and defendant at an apartment they had moved

into as roommates months after the June 28 incident. Defense counsel asked Jessica why she had asked Emilia to leave and if anything unusual occurred while she was there. Objections to these questions on relevance grounds were sustained.

At the end of the day, a police report was presented to the trial court. It detailed that on October 23, 2010, Jessica and defendant reported that Emilia came to the apartment belonging to defendant and Jessica. Emilia wanted defendant to get back together with her. When he refused, she told him that she was going to tell the judge "everything he wants to hear." Further, she banged her head against the wall and said, "Don't do that to me." Only Jessica and defendant witnessed this behavior by Emilia. Defendant wanted to call Jessica as a witness in order to properly cross-examine her on the incident occurring on October 23.

The trial court saw the issue as involving Evidence Code section 352. It found that if the police report was generated by defendant, it was not trustworthy. The trial court further stated, "It [is] a 352 issue, and we are getting far afield with regard to what happened on June 28 of the year 2010."

Defendant was concerned that Emilia did not want to testify because she was afraid that she would incriminate herself; she was lying about what happened on June 28; and the October 23 incident was relevant to attack her credibility. The People responded they had a good faith belief that Emilia was a subject of domestic violence on June 28 and did not have to testify under Code of Civil Procedure section 1219. Defendant's motion for mistrial and to admit the evidence was denied.

B.     *Analysis*

Under California law, unless otherwise provided by statute, all relevant evidence

is admissible.  (Evid. Code, § 351; *People v. Basuta* (2001) 94 Cal.App.4th 370, 386.)

Relevant evidence is evidence having any reasonable tendency to prove or disprove a

disputed issue.  (Evid. Code, § 210.)  However, the trial court has discretion to exclude

evidence if its probative value is substantially outweighed by the probability that its

admission will require undue consumption of time or create substantial danger of

prejudice or of confusing or misleading the jury.  (Evid. Code, § 352.)  For purposes of

Evidence Code section 352, "probative value" is used interchangeably with the term

"relevance" under Evidence Code section 210.  (*People v. Hill* (1992) 3 Cal.App.4th 16,

29, disapproved on another ground in *People v. Nesler* (1997) 16 Cal.4th 561, 582, fn. 5.)

We review the trial court's determination on admissibility of evidence for an abuse

of discretion, examining the evidence in the light most favorable to the court's ruling, and

will reverse only if the trial "'"court exercised its discretion in an arbitrary, capricious or

patently absurd manner that resulted in a manifest miscarriage of justice."'  [Citations.]"

(*People v. Ochoa* (2001) 26 Cal.4th 398, 437–438.)

As for the payment of rent on the Foxdale house, the trial court reasonably

concluded that it was not relevant.  The jury was already informed that defendant and

Emilia signed a one-year lease for the Foxdale house.  The trial court advised the jury

that defendant and Emilia were jointly responsible for the rent.  Despite the lease,

defendant moved into another apartment, and Jessica had moved into the Foxdale house

23

in his place. As set forth in detail in part III, *ante*, defendant did not have an unconditional right to enter the Foxdale house even though he was on the lease and responsible for the rent. The fact that he allegedly paid the rent on the home occupied by his wife and two children does not change the fact that he moved out and had his own apartment. The trial court did not act arbitrarily or capriciously in excluding the evidence as irrelevant.

The trial court excluded, under Evidence Code Section 352, the incident occurring on October 23 as irrelevant and presumably because it would result in an undue consumption of time. The October 23 incident had very little relevance to the occurrence on June 2010. The report was not trustworthy because it was made by defendant and Jessica. Jessica admitted at trial she did not want to testify because defendant was like family to her. Moreover, Emilia did not falsify her injuries on June 28; she was bleeding and had many lacerations. Defendant never contended that he did not cause the injuries, whether they were accidental or intentional. Evidence that Emilia falsely accused defendant of hitting her in a separate incident months later was simply not relevant, would result in an undue consumption of time, and was properly excluded by the trial court.

Defendant contends that the jury would have had much different view of Emilia's credibility through the cross-examination of Jessica. However, based on Emilia's refusal to testify and reluctance to speak with Captain O'Dowd, the jury already reasonably could be suspect of Emilia's statements and actions.

Moreover, defendant cannot show prejudice by the exclusion of the evidence. Application of the ordinary rules of evidence, including Evidence Code section 352, does not impair a defendant's right to present a defense (*People v. Boyette* (2002) 29 Cal.4th 381, 414, 427-428), and we review the erroneous exclusion of evidence to determine whether it was reasonably probable a result more favorable to the defendant would have been reached in the absence of the error (*id*. at p. 429; *People v. Watson* (1956) 46 Cal.2d 818, 836).

Based on the strong evidence supporting defendant's guilt, a result more favorable to defendant would not have been reached had the evidence been admitted. The jury was already aware that defendant and Emilia had a one-year lease on the Foxdale house and that defendant came to the house to see his children and Emilia on occasion. The fact he also was paying rent would not have changed the fact that he and Emilia were admittedly having marital problems and that he had rented a new apartment. Moreover, it does not appear he actually did pay the rent since he admitted that they were evicted. This evidence would not have changed the strong evidence before the jury that defendant did not have an unconditional right to enter the Foxdale house.

Additionally, there is no dispute that Emilia suffered serious injuries to her face, and the only person present during the incident was defendant. Although at some point another male was in Emilia's bedroom, there simply was no evidence, other than defendant's self-serving statements, that this male remained in the room when Emilia was being hit. Emilia emerged from her room bloody, and defendant chased after her. There

was no sign of this other male. Defendant chased Emilia outside and then threw her to the ground. The evidence established that defendant caused the injuries to Emilia. In fact, defendant stated at the scene and again at the police station that he beat Emilia up.

The evidence overwhelmingly supported that defendant threw a rock through a window in order to gain access to Emilia's locked bedroom and then proceeded to beat her up. Any conceivable error occasioned by the exclusion of defendant's evidence was not prejudicial.

## V

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS.


RICHLI _____
J.

We concur:

McKINSTER _____
Acting P. J.


KING _____
J.

26