Filed 2/5/15  P. v. Guzman CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B240155 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA115722) |
| v. | |
| FERNANDO GUZMAN et al., | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of Los Angeles County, Eleanor J. Hunter, Judge.  Affirmed.

Joanna McKim, under appointment by the Court of Appeal, for Defendant and Appellant Fernando Guzman.

Brett Harding Duxbury, under appointment by the Court of Appeal, for Defendant and Appellant Luis Angel Rodriguez.

John A. Colucci, under appointment by the Court of Appeal, for Defendant and Appellant Jesus Trujillo.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Linda C. Johnson and Robert M. Snider, Deputy Attorneys General, for Plaintiff and Respondent.

Appellants Fernando Guzman, Luis Angel Rodriguez, and Jesus Trujillo appeal from the judgments entered following their convictions by jury on count 1 – first degree murder (Pen. Code, § 187)[1] with a lying-in-wait special circumstance (§ 190.2, subd. (a)(15)) and count 2 – shooting at an inhabited dwelling (§ 246) with a principal armed with a firearm (§ 12022, subd. (a)), with findings as to each offense a principal personally used a firearm, personally and intentionally discharged a firearm, and personally and intentionally discharged a firearm causing great bodily injury and death (§ 12022.53, subds. (b), (c), (d) & (e)(1)), and the offense was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)). The court sentenced each appellant to prison for 50 years to life. We affirm.

### FACTUAL SUMMARY

1. *People's Evidence*.

    a. *The Murder of Jonathan Escobar*.

Viewed in accordance with the usual rules on appeal (*People v. Ochoa*) (1993) 6 Cal.4th 1199, 1206 (*Ochoa*), the evidence established that about 7:00 p.m. on November 19, 2010, appellants, Nathalie Roman, and Cindy Nunez were at Roman's home in Paramount. Several of Guzman's friends, including Miguel Cossio-Almeda, and Scrappy, were there. Appellants, Cossio-Almeda, Roman, and Nunez were members of the DMS criminal street gang (DMS).[2]

While in Roman's home, Trujillo and Cossio-Almeda spoke ill of Jonathan Escobar (the decedent) and said, "Fuck that fool." Escobar was a member of M2K, a tagging crew affiliated with the Paramount Varrio gang (Varrio) in Paramount. DMS was a rival of M2K and Varrio. Guzman and Escobar were friends and when Trujillo and Cossio-Almeda spoke ill of Escobar, Guzman defended him. Cossio-Almeda talked about a shotgun, a ".22," and a "nine-millimeter," and showed a photograph of those

---

[1]     Subsequent statutory references are to the Penal Code.

[2]     As we discuss later, Guzman was a member of a clique that was part of DMS.

2

weapons to Roman. Sometime after 11:00 p.m., Guzman asked Roman to ask Rodriguez if Guzman could borrow Rodriguez's truck. Guzman and Scrappy left in the truck. Rodriguez, Trujillo, and Cossio-Almeda followed in Cossio-Almeda's car.

About 11:50 p.m., Charlene Peacock was in her apartment at 8237 Somerset in Paramount. Escobar lived in the apartment complex. Peacock heard a distant shotgun blast, a closer shotgun blast, then three or four quieter shots. Several bullets entered Peacock's home; others struck the complex. Peacock called 911 and reported seven shots were fired and a car was speeding away.

Peacock later looked out her window and saw the complex's pedestrian gate open. Escobar staggered into the complex with blood on his shirt and collapsed in the driveway of the parking structure. Rodriguez jumped a fence and landed on a minivan. He leaned across the front of the minivan and aimed and fired a shotgun at Escobar. Trujillo and Guzman entered via a side gate. Guzman was unarmed. Trujillo lay on the ground and aimed and fired a handgun at Escobar. Escobar sustained two gunshot wounds, a fatal .22-caliber wound in the back, and a wound on the back of his right forearm. A detective testified Escobar was shot after 11:46 p.m. but before 11:50 p.m. Guzman never went to Escobar after he was shot to see if he was okay.

A fourth man holding a gun stood near a car outside the gate. He was yelling orders and telling others to make sure Escobar was dead. Guzman seemed to be afraid. Peacock testified Guzman said, " 'I guess they supposedly came over just to talk to [Escobar] or to scare [him], not to kill him.' " Peacock also testified Guzman said, " 'I thought you guys was gonna,' " but Guzman was interrupted and someone grabbed him. At some point Rodriguez or Trujillo told Guzman to shut up. Peacock testified the fourth man hurried appellants into a car that drove away, but she was not sure each appellant entered the car. A Camry belonging to Cossio-Almeda drove away. Rodriguez's truck was nearby.

3

b. *Additional Evidence*.

Deputies recovered eight .22-caliber casings in the street, sidewalk, and driveway, and the evidence was consistent with shots having been fired from the street. The casings came from the same firearm. Two plastic waddings from a shotgun shell were recovered, one in the driveway, the other adjacent to the driveway.

Deputies found a cell phone next to Escobar's body. The cell phone belonged to Escobar's father. A cell phone was also recovered from Guzman when he was arrested on December 7, 2010. Escobar's cell phone received text messages from Guzman's cell phone asking Escobar to walk out to the front of the location. At 11:46 p.m. on November 19, 2010, Escobar's cell phone received a message from Guzman's cell phone that said, "Foo come." At 11:47 p.m., Escobar's cell phone sent a message to Guzman's cell phone that said, "I am." At "11:55" p.m., Escobar's cell phone received two messages from Guzman's cell phone. One said, "Where you at, foo? I'm here." The other said, "Ima bounce. You're taking too long. Lates."

At 12:09 a.m. on November 20, 2010, Escobar's cell phone received a long message from Guzman's cell phone. The message included the words, "Be careful," "Paramount looking," "Anyone to," and "Truchas foo." Los Angeles County Sheriff's Detective Kasey Woodruff testified if someone sent Escobar a text "warning him to watch out for Eastside Paramount because they're looking for someone to shoot" this would aid the sender "like an alibi."

Woodruff testified that on December 16, 2010, Nunez told him the following. Guzman told Nunez concerning the murder, "they killed the victim." Guzman also told Nunez that he killed Escobar[3] and if she revealed the killing, she would be killed.

---

[3]     Notwithstanding Guzman's argument that Woodruff was "pressed by the prosecutor" to testify that Nunez told Woodruff that Guzman told Nunez that he killed Escobar, Woodruff's testimony on this issue occurred after Woodruff refreshed his memory with his notes.

Woodruff testified Roman told him the following. The same five people who left Roman's house later returned, and both vehicles returned. Guzman and Scrappy were still in the truck. Guzman said, " 'I thought we were just going to talk but those fools just started shooting.' "

c. *Gang Evidence*.

Woodruff, a gang expert, testified about, inter alia, DMS and a Paramount clique as follows. (We italicize below facts pertinent to an issue we later address, i.e., whether the Paramount clique was part of DMS.) *DMS* was a criminal street gang the primary activities of which included assault and murder.[4]

*Rodriguez and Trujillo* were *DMS* members. The shooting was committed for the benefit of, at the direction of, and in association with, *DMS*. The present offense occurred in M2K territory.

There were about 28 members in DMS. When the prosecutor asked Woodruff what territory "they" claimed, Woodruff testified there were "two territories, with two, separate cliques." The original started in Lynwood, followed by the Paramount clique. The *Paramount clique's* vandalism said, "*DMS, DMS13*, maybe a moniker." (Italics added.) The Paramount clique was new, consisted of six to seven members, and was trying to gain territory where Escobar lived. Woodruff testified concerning the *Paramount* clique, ". . . *DMS* was starting to try out new clique, *their* clique. The area *they're* trying to call their own is the area traditionally known as Paramount Varrio . . . ." (Italics added.)

Woodruff testified he asked Roman "how many *DMS* are in the *Paramount clique*" and she indicated who was in *that clique*, namely, *appellants*, Roman, Nunez, and a person named Juero. (As mentioned, Woodruff also testified Rodriguez and Trujillo

---

**4** As part of the proof of the predicate offenses required to establish a "pattern of criminal gang activity" for purposes of section 186.22, subdivisions (b)(1), (e), and (f), the People proved Cossio-Almeda and Javier Cueros each committed a qualifying offense. Woodruff testified Cossio-Almeda and Cueros were *DMS* members.

5

were DMS members.)  *Rodriguez* was the leader of the *Paramount clique*.  We note Guzman appeared to acknowledge the Paramount clique was part of DMS when Guzman's counsel cross-examined Woodruff at trial as follows:  "Q.  Now, the territory that you were saying that the *Paramount* – the *DMS* clique is trying to claim is actually territory that previously belonged to Paramount Varrio; is that correct?  [¶]  A.  Yes."

2.  *Defense Evidence*.

In Guzman's defense, a gang expert testified DMS was not a gang but a tagging crew.  Sometimes gang members planned crimes of which a particular gang member was unaware.  Guzman's shocked look at the scene was consistent with a reaction to an unexpected event.  The word "Truchas" meant "be careful."  Rodriguez and Trujillo presented no defense witnesses.

## ISSUES

Appellants claim the trial court erred in its response to a jury question concerning aiding and abetting liability.  Guzman claims (1) the trial court erroneously failed to instruct on aiding and abetting, (2) there was insufficient evidence he aided and abetted murder, (3) there was insufficient evidence he committed first degree murder, (4) there was insufficient evidence supporting the special circumstance finding, and (5) there was insufficient evidence supporting his conviction on count 2.  Rodriguez and Trujillo claim there was insufficient evidence supporting the gang enhancement finding.[5]

## DISCUSSION

1.  *The Trial Court Properly Responded to the Jury's Question*.

a.  *Pertinent Facts*.

At 9:30 a.m. on Friday, January 13, 2012, the jury began deliberations.  At 11:05 a.m., the jury by a written note asked the court two questions:  "(1) If an individual aids and abets, even without intent, can that person be guilty of murder or any other

---

[5]     Each appellant joins in the other's arguments.

6

charge[?]" and "(2) Can an individual who does not have the intent of murder be convicted with murder, if he aids and abets an individual who does have the intent?"

Outside the presence of the jury, the court indicated, inter alia, it intended merely to refer the jury to CALCRIM Nos. 400, 401, and 403. Guzman argued the court had to answer the first question in the negative "because the instruction specifically says that they need to have that intent" and any other answer would be misleading. Guzman's counsel argued the court's answer to the second question should be, "only if they're convinced beyond a reasonable doubt that he intended to aid and abet in the act of murder or an act which has a natural probable consequence resulting in the murder."

The court observed appellants previously had agreed to the instructions and the court believed they fully instructed the jury. The court returned the jury's note after writing on it, "Please refer to jury instructions # 400, 401 and 403. If you need anything further, please inform the court." At noon, the jury notified the court the jury had reached its verdicts. We will present additional facts below where pertinent.

b. *Analysis.*

Appellants claim the trial court erred in its response to the jury's note. We disagree. The jury's first question could be construed as asking if a defendant could be guilty of a charge if the defendant aided and abetted *without intent* to aid and abet. However, the court's response referred the jury to, inter alia, CALCRIM No. 401, on aiding and abetting, and that instruction stated (1) the People had to prove, inter alia, "Before or during the commission of the crime, the defendant *intended* to aid and abet the perpetrator in committing the crime" (italics added) and (2) someone aids and abets if, inter alia, "he *specifically intends to*, . . . aid." (Italics added.) Guzman's trial counsel conceded "the instruction specifically says that *they need to have that intent*." (Italics added.)

7

The jury's second question could be construed as asking if a defendant could be guilty of murder if the defendant lacked intent to murder but *unintentionally* aided and abetted a second person who harbored intent to murder (and murdered). To that extent, the above analysis controls.

The jury's second question alternatively could be construed as asking if a defendant could be guilty of murder if the defendant *lacked intent to murder* but *intentionally* aided and abetted a second person who harbored intent to murder (and murdered). The court gave CALCRIM No. 401 on aiding and abetting, and CALCRIM No. 403, on aiding and abetting, and natural and probable consequences. CALCRIM No. 403 told the jury, inter alia, "To prove that the defendant is guilty of murder, the People must prove that: [¶] 1. The defendant is guilty of *assault with a firearm*; [¶] 2. During the commission of assault with a weapon a coparticipant in that assault with a firearm committed the crime of *murder*; [¶] AND [¶] 3. Under all of the circumstances, *a reasonable person in the defendant's position would have known that the commission of the murder was a natural and probable consequence of the commission of the assault with a firearm*." (Italics added.) CALCRIM Nos. 401 and 403 effectively answered in the affirmative the alternative construction of the second question.

As our Supreme Court stated in *People v. Gonzalez* (1990) 51 Cal.3d 1179 (*Gonzalez*), "Where, as here, the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information. [Citation.] [The trial court] fulfilled that duty, and no error or prejudice appears." (*Id.* at p. 1213.)

The jury was given a copy of the written instructions for use during deliberations. They were full and complete for purposes of the facts before the jury. Trujillo concedes the instructions were complete. A court does not always have to elaborate on standard instructions. The court's reply note directed the jury's attention to *specific* instructions and told the jury if it needed anything further to inform the court. The court received no further inquiry from the jury. The trial court's response to the jury was not error.

8

(Cf. *Gonzalez, supra*, 51 Cal.3d at pp. 1212-1213; *People v. Moore* (1996) 44 Cal.App.4th 1323, 1331; *People v. Hill* (1992) 3 Cal.App.4th 16, 25.)[6]

Moreover, even if the trial court erred, it does not follow we must reverse the judgment. The jury's note suggested it was inquiring about whether a defendant could *unintentionally* aid and abet and whether a defendant could be guilty of murder as an aider and abettor *without intent to murder*.

However, first, our Factual Summary and parts 3 and 5 of our Discussion demonstrate there was *ample evidence* (1) appellants (with Guzman as an *intentional* aider and abettor, and Rodriguez and Trujillo as direct perpetrators) committed the first degree *intent-to-kill* murder of Escobar based on the theories, as to the degree of the murder, it was *willful, deliberate and premeditated,* and *committed by lying in wait* (where lying in wait required a state of mind equivalent to premeditation and deliberation),[7] (2) appellants satisfied the lying-in-wait special circumstance (where lying

---

[6] *People v. Loza* (2012) 207 Cal.App.4th 332 (*Loza*) and *People v. Nero* (2010) 181 Cal.App.4th 504 (*Nero*), cited by Guzman, are inapposite. In each of those cases, the trial court's response to jury questions directed the jury to a previously given instruction's language indicating an aider and abettor, and a direct perpetrator, were *equally* guilty. (In *Loza*, this language was in CALCRIM No. 400; in *Nero*, the language was in CALJIC No. 3.00.) Although that language is generally true, it is a misstatement of law when applied to facts in cases like *Loza* and *Nero* where an issue at trial is whether the defendant aider and abettor had a *less culpable* mental state than the direct perpetrator, i.e., cases in which the defendant aider and abettor properly could be convicted of a *lesser* offense than the direct perpetrator. However, CALCRIM No. 400, has been modified with the result the version thereof the trial court in the present case gave to the jury does not contain the above mentioned misstatement of law.

[7] The court, using CALCRIM No. 521, instructed the jury that lying in wait for purposes of first degree lying-in-wait murder required a state of mind equivalent to premeditation and deliberation. There is no dispute this was a correct statement of law.

9

in wait required a state of mind equivalent to premeditation and deliberation),[8] and (3) appellants committed the murder to benefit DMS.[9]

Second, the jury, properly instructed,[10] *found* (1) appellants committed the first degree murder of Escobar, where the theories, as to the degree of the murder, were the murder was willful, deliberate and premeditated, and committed by lying in wait (with lying in wait equivalent to premeditation and deliberation), (2) appellants had satisfied the lying-in-wait special circumstance (with intent to kill required as to an aider and abettor,[11] and lying in wait equivalent to premeditation and deliberation), and (3) appellants committed the murder to benefit DMS. In sum, the ample evidence and jury findings indicate appellants' mental states were, and the jury impliedly found they were, far more culpable than any purported unintentional aiding and abetting, or any aiding and abetting without intent to murder (with liability based merely on natural and

---

[8] The court, using CALCRIM No. 728, instructed the jury that the lying-in-wait special circumstance required a state of mind equivalent to premeditation and deliberation. There is no dispute this was a correct statement of law.

In part 3 of our Discussion, we reject Guzman's various sufficiency contentions concerning murder, first degree murder, and the special circumstance. Moreover, although Rodriguez and Trujillo join in Guzman's sufficiency contentions, those contentions were largely based on Guzman's alleged status as an aider and abettor. However, there was ample evidence Rodriguez and Trujillo were direct perpetrators. To the extent Rodriguez and Trujillo join in Guzman's sufficiency contentions supported by Guzman's arguments concerning his alleged status as an aider and abettor, Rodriguez and Trujillo have failed to demonstrate prejudicial error. (See *Nero, supra,* 181 Cal.App.4th at p. 510, fn. 11.)

[9] In part 5 of our Discussion, we reject the contentions of Rodriguez and Trujillo that insufficient evidence supported their respective gang enhancement findings.

[10] In part 2 of our Discussion, we reject Guzman's claim of prejudicial instructional error concerning the degree of murder.

[11] The court, using CALCRIM No. 702, instructed the jury that the lying-in-wait special circumstance required an aider and abettor of first degree murder to harbor intent to kill. There is no dispute this was a correct statement of law.

10

probable consequence theory). Any trial court error in its response to the jury's note was not prejudicial under any conceivable standard. (Cf. *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*); *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705] (*Chapman*).)

2. *The Trial Court Did Not Erroneously Fail to Instruct on Aiding and Abetting, Natural and Probable Consequences, and First Degree Murder.*

Guzman claims the trial court erroneously failed to instruct on aiding and abetting as they related to natural and probable consequences. He argues the trial court erroneously failed to instruct the jury had to find that murder of the *first degree*, not merely murder, was a natural and probable consequence (i.e., a reasonably foreseeable consequence) of an aided and abetted assault with a firearm. Guzman's claim is unavailing.

We assume without deciding Guzman's claim is correct. (See *People v. Woods* (1992) 8 Cal.App.4th 1570 (*Woods*).)[12] However, even if the trial court erred, it does not

_____

[12]      *Woods,* cited by Guzman, is distinguishable. In *Woods*, the appellate court concluded second degree murder by a confederate was a reasonably foreseeable consequence of assaults the defendant aided and abetted, and "the trial court had a duty to inform the jurors they could convict [the defendant] of second degree murder as an aider and abettor even though they found [the confederate] was guilty of first degree murder. (*Woods*, *supra*, 8 Cal.App.4th at p. 1578.) However, in *Woods*, unlike in the present case, the jury asked the trial court, "Can a defendant be found guilty of aiding and abetting a murder in the second degree if the actual perpetrator of the same murder is determined to be guilty of murder in the first degree?" and the trial court erroneously answered no. (*Id.* at pp. 1579-1581.)

*People v. Favor* (2012) 54 Cal.4th 868 (*Favor*), cited by respondent, is distinguishable. *Favor* concluded, "Under the natural and probable consequences doctrine, there is no requirement that an aider and abettor reasonably foresee an attempted *premeditated* murder as the natural and probable consequence of the target offense. It is sufficient that *attempted murder* is a reasonably foreseeable consequence of the crime aided and abetted, and the attempted murder itself was committed willfully, deliberately and with premeditation." (*Id.* at p. 880, italics added.) However, *Favor* involved attempted murder and not, as in the present case, murder. There is one offense of attempted murder. Attempted premeditated murder and attempted unpremeditated

follow we must reverse the judgment. The prejudice analysis in part 1 of our Discussion is similarly applicable here. The ample evidence and jury findings discussed in that analysis indicate Guzman's mental state was, and the jury impliedly found it was, far more culpable than the mental state of a person who merely reasonably should have foreseen a consequence of an aided and abetted assault with a firearm might be murder of the first degree. No prejudicial error occurred under any conceivable standard. (Cf. *Watson*, *supra*, 46 Cal.2d at p. 836; *Chapman*, *supra*, 386 U.S. at p. 24.)[13]

3. *Sufficient Evidence Supports Guzman's First Degree Murder Conviction and the Lying-In-Wait Special Circumstance Finding.*

Guzman presents related claims there is insufficient evidence (1) he committed murder, (2) the murder was of the first degree, and (3) he committed the lying-in-wait special circumstance. We reject the claims.

a. *There Was Sufficient Evidence of First Degree Premeditated Intent-to-Kill Murder.*

We examine the issue of whether Guzman was liable as an aider and abettor,[14] and our power begins and ends with the determination whether there is substantial evidence,

---

murder are not separate offenses, attempted murder is not divisible into degrees, and whether an attempted murder was premeditated merely goes to the issue of punishment. Accordingly, only attempted murder, and not whether it was premeditated, must be a natural and probable consequence of the target offense aided and abetted. However, first degree murder and second degree murder are separate offenses, and murder is divisible into degrees; therefore, it is arguable *premeditated* murder must be a natural and probable consequence of the target offense aided and abetted. This issue is pending before our Supreme Court in *People v.* Chiu, review granted August 15, 2012, S202724.

[13] In light of our analysis, there is no need to reach the issue of whether, as respondent claims, Guzman failed to preserve his instructional issue for appellate review. (See *People v. Palmer* (2005) 133 Cal.App.4th 1141, 1156.)

[14] A "person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561.) Factors relevant to a determination of whether a

12

contradicted or uncontradicted, to support the judgment. (*People v. Hernandez* (1990) 219 Cal.App.3d 1177, 1181-1182.) There was substantial evidence as follows.

Appellants were DMS members. (We discuss this issue further in part 5 of our Discussion.) This evidenced commonality of purpose. DMS and M2K were rivals, a fact providing Guzman with a motive to commit the first degree murder of Escobar, an M2K member. On November 19, 2010, the date of the murder, Guzman met with other DMS members and friends at the home of a DMS member and, while Guzman was there, Trujillo and Cossio-Almeda expressed ill-will concerning Escobar, and firearms were discussed.

Guzman borrowed the truck belonging to Rodriguez, the Paramount clique's leader. Guzman and Scrappy went to the shooting scene in the truck, followed by Rodriguez, Trujillo, and Cossio-Almeda (another DMS member) in Cossio-Almeda's vehicle. The clique, of which appellants were members, was trying to gain territory in an area where Escobar lived and which was claimed by Varrio.

Guzman texted messages to Escobar, asking him to come outside. Based on all the evidence, the jury reasonably could have concluded the messages were ruses to facilitate the later ambush shooting of Guzman in M2K territory. After Escobar went outside, the sounds of multiple shotgun blasts and gunshots filled the air. Bullets hit the apartment complex and bullets entered Peacock's apartment. The pedestrian gate of the apartment complex's carport opened, Escobar staggered in with blood on his shirt, and collapsed.

Even after the fusillade of shotgun blasts and gunfire fired from outside the complex, appellants, including Guzman, entered the apartment complex and approached the fallen Escobar. Rodriguez and Trujillo, direct perpetrators, then aimed and fired their weapons at Escobar. Escobar was mortally wounded. Guzman never went to Escobar's

---

defendant was an accomplice include presence at the scene of the crime, companionship, and conduct before and after the offense. (*People v. Singleton* (1987) 196 Cal.App.3d 488, 492.)

13

aid. Guzman himself suggested at the scene he had known of a plan to expose Escobar to harm, because Guzman mentioned at the scene, inter alia, they were supposed to frighten Escobar. The fourth man at the scene, yelling orders, telling others to make sure Escobar was dead, and helping appellants, including Guzman, to escape, implied the fourth man was a leader of the *group*.

After the shooting, Guzman texted Escobar again. The message suggested it was a warning about Varrio but the message omitted any mention of the fact Guzman knew Rodriguez and Trujillo, Guzman's fellow gang members, had deliberately shot and killed Escobar in an ambush arranged by Guzman's ruses. The jury reasonably could have concluded this last message was an effort to conceal Guzman's involvement in the premeditated ambush and murder of Escobar. After the shooting, Guzman and Scrappy returned to Roman's house, as did Rodriguez, Trujillo, Cossio-Almeda, and the vehicles in which all of these confederates earlier had left the house.

Guzman admitted to Nunez "they killed the victim" and Guzman had killed Escobar. Guzman threatened Nunez with death if she told anyone; the threat evidenced consciousness of guilt. Woodruff opined the shooting was committed for the benefit of, at the direction of, and in association with, DMS. Based on all of the above facts, we conclude there was sufficient evidence to convince a rational trier of fact, beyond a reasonable doubt, Guzman, as an aider and abettor, committed the first degree willful, deliberate, and premeditated intent-to-kill murder of Escobar. (*Ochoa*, *supra*, 6 Cal.4th at p. 1206.) We also conclude the murder was a reasonably foreseeable consequence of assaults with a firearm Guzman aided and abetted. The mere fact there may have been conflicting evidence on issues such as Guzman's state of mind does not compel contrary conclusions.

b. *There Was Sufficient Evidence of First Degree Lying-In-Wait Murder and Sufficient Evidence Supporting the Lying-in-Wait Special Circumstance Finding*.

Guzman presents related claims there is insufficient evidence the murder was of the first degree based on lying-in-wait theory, and insufficient evidence supporting the

14

lying-in-wait special circumstance finding.  He argues as to first degree lying-in-wait theory he lacked the requisite "inten[t] . . . to make a surprise attack on" Escobar.[15] Guzman argues as to the lying-in-wait special circumstance he lacked the requisite intent to kill.[16]

We incorporate here our discussion above that there was sufficient evidence to convince a rational trier of fact, beyond a reasonable doubt, Guzman, as an aider and abettor, committed the first degree willful, deliberate, and premeditated *intent-to-kill* murder of Escobar.  Accordingly, there was sufficient evidence the murder was of the first degree based on lying-in-wait theory, and sufficient evidence supporting the lying-in-wait special circumstance finding.  (*Ochoa*, *supra*, 6 Cal.4th at p. 1206.)

4. *Sufficient Evidence Supports Guzman's Conviction for Shooting at an Inhabited Dwelling*.

Guzman claims there is insufficient evidence he aided and abetted shooting at an inhabited dwelling (count 2).[17]  He argues there is no evidence he "aided and abetted his companions in firing their guns," "knew the others in the group intended to commit a deadly assault," or "intended to facilitate the crime," and no evidence his "texts helped co-defendants shoot at the apartment complex."[18]

---

[15]     The court, using a modified CALCRIM No. 521, employed the above quoted language when instructing on the requisite intent for first degree murder based on lying-in-wait theory.  There is no dispute this was a correct statement of law.

[16]     The court, using modified CALCRIM Nos. 702 and 728, instructed on the lying-in-wait special circumstance.  The modified CALCRIM No. 728 required that a defendant "intend[] to kill the person by taking the person by surprise."  The modified CALCRIM No. 702 required that a defendant who was not the actual killer but who was guilty of first degree murder as an aider and abettor act with intent to kill.  There is no dispute these were correct statements of law.

[17]     Count 2 was based on the shooting "at an inhabited dwelling house, occupied building" at 8237 Somerset in Paramount.

[18]     See fn. 14, *ante*.

We incorporate here our discussion in part 3, *ante*, that there was sufficient evidence to convince a rational trier of fact, beyond a reasonable doubt, Guzman, as an aider and abettor, committed first degree intent-to-kill murder based on the theories it was willful, deliberate, and premeditated, and committed by lying in wait. Moreover, the shootings occurred near and in the apartment complex and near Peacock's apartment in the complex, resulting in bullets hitting the complex and her apartment. We conclude there was sufficient evidence to convince a rational trier of fact, beyond a reasonable doubt, that Guzman, as an aider and abettor, committed the offense of which he was convicted as to count 2. (*Ochoa*, *supra*, 6 Cal.4th at p. 1206.)

5. *There Was Sufficient Evidence Supporting the Gang Enhancement Findings as to Rodriguez and Trujillo.*

Rodriguez and Trujillo claim there was insufficient evidence supporting their respective gang enhancements. We reject their claims.

Rodriguez and Trujillo argue the Paramount clique was not a "criminal street gang" for purposes of section 186.22, subdivisions (b)(1) and (f), because there was insufficient evidence the Paramount clique had as "one of its primary activities the commission of one or more of the criminal acts" identified in subdivision (f). Moreover, Rodriguez argues the Paramount clique was not a "criminal street gang" because there was insufficient evidence the Paramount clique engaged in a "pattern of criminal gang activity" for purposes of section 186.22, subdivisions (b)(1), (e), and (f), since, according to Rodriguez, there was insufficient evidence of two or more predicate offenses required by subdivision (e).

Finally, relying on *People v. Williams* (2008) 167 Cal.App.4th 983 (*Williams*), Rodriguez and Trujillo argue there was insufficient evidence supporting their respective gang enhancements because there was insufficient evidence DMS and the Paramount clique shared collaborative activities or a collective organizational structure.

16

However, we have italicized pertinent facts in our recitation of the gang evidence in our Factual Summary. There was substantial evidence the Paramount clique *was part of the DMS criminal street gang,* including substantial evidence, inter alia, DMS and the clique at least partially shared membership, and *DMS*, by starting the Paramount clique, was expanding *DMS's* territory. Rodriguez concedes, "The prosecution offered substantial evidence that DMS constituted a criminal street gang" and "Paramount claimed the symbols, signs, and heritage of DMS." We hold there was substantial evidence supporting the respective gang enhancements of Rodriguez and Trujillo. (*Ochoa, supra,* 6 Cal.4th at p. 1206.)

In light of the above analysis, we reject the arguments of Rodriguez and Trujillo pertaining to the *Paramount* clique and "primary activities," and the argument of Rodriguez pertaining to the *Paramount* clique and a "pattern of criminal gang activity." We note the predicate offenses for purposes of the "pattern of criminal gang activity" requirement were committed by persons whom Woodruff testified were *DMS* members. We also reject the argument of Rodriguez and Trujillo that there was insufficient evidence supporting the gang enhancements because DMS and the Paramount clique did not share collaborative activities or a collective organizational structure. That argument is based on *Williams,* a case involving, not a *clique* that was *part of a criminal street gang* in the circumstances presented by this case, but *two separate criminal street gangs* where the only commonalities between them were ideology and names that contained the same word.[19] (*Williams*, *supra*, 167 Cal.App.4th at pp. 986-989.)

---

[19] The issue of whether evidence of a collaborative or organizational nexus is required before multiple subsets of the Norteños can be treated as a whole for the purpose of determining whether a group constitutes a "criminal street gang" within the meaning of section 186.22, subdivision (f) is pending before our Supreme Court in *People v. Prunty*, review granted June 26, 2013, S210234.

### DISPOSITION

The judgments are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


KITCHING, J.

We concur:


KLEIN, P. J.


ALDRICH, J.


18